The BOEING COMPANY, Plaintiff,

v.

CASCADE CORPORATION, Defendant.

No. CV. 89–119–MA.

United States District Court,
D. Oregon.

Feb. 6, 1996.

Paul T. Fortino, David A. Bledsoe, Perkins Coie, Portland, OR, Mark W. Schneider, Perkins Coie, Seattle, WA, for Plaintiff.

Garr M. King, George W. McKallip, Kennedy, King & Zimmer, Portland, OR, for Defendant.

## OPINION AND ORDER

MARSH, District Judge.

Plaintiff The Boeing Company (Boeing) filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601 *et seq* (CERCLA) and analogous Oregon environmental statutes seeking contribution from defendant Cascade Corporation (Cascade) for investigation and response costs to remedy contaminated groundwater. Plaintiff also seeks a declaratory judgment establishing each party's percentage share of future costs.

A bench trial was held December 4–20, 1995. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. *INTRODUCTION*

This case is about a contaminated groundwater plume for which both plaintiff and defendant are partially responsible. While the central issues of the case are relatively simple, the geological, hydrogeological, chemical, and scientific issues set the stage for a challenging and complicated factual dispute. Thankfully, both parties were represented by superior attorneys, and each presented their respective positions through well prepared memos, exhibits and knowledgeable experts. The parties shared scientific data, exchanged experts' testimony and fully explored each others' theories without the acrimony that often infects litigation in the 1990s.

The proximity of the two properties involved, the complicated migration and inter-

mixing of contaminants with varied and insidious qualities, and the unique geologic characteristics of the two properties make precise determination of the amount of contamination attributable to each party extremely difficult if not impossible. The mass, scope, and magnitude of the contamination eludes exactitude despite more than ten years of concerted investigative efforts. Each party has expended considerable resources and time attempting to investigate and remedy this very complex situation. Further, all of this activity occurs amid intricate regulatory and statutory requirements, as well as intensive governmental scrutiny.

While factually complex, the legal issues in this case are fairly straightforward. First, I must determine whether defendant is liable for a portion of plaintiff's expenditures to date and, if so, what portion. Second, I must determine whether defendant is liable for a fixed percentage of future response costs. Finally, I must decide whether plaintiff's settlement with prior landowners and operators must be factored into the computation, thereby reducing plaintiff's recovery.

To accomplish this task, I begin by examining the parties and their properties, the geology and hydrogeology of the area, the contaminant plume, contamination within the plume, and the parties' investigations.

## II. FINDINGS OF FACT

### A. Parties and properties

Boeing currently owns real property located at 19000 N.E. Sandy Boulevard, Gresham, Oregon, on which it manufactures and refurbishes airplane parts. Boeing began leasing the property in 1974 and ultimately purchased it in 1979. Prior to and during Boeing's ownership of the property, the site was operated by a number of companies, including ESC (from 1964–1971); Radiation International, Inc. (1971–1974); Datron Systems, Inc. (1971–1983); and ElecSpec International, Inc. (1983–1985).

The Boeing property consists of approximately 151 acres. As shown on Figure 1, three buildings are located from the center to the eastern side of the property: Building 85–120 is located near the northeast corner of the Boeing property, Building 85–001 is located west and slightly south of building 85–120, and Building 85–105 is located near the southeast corner of the Boeing property, southeast of Building 85–001 and southwest of Building 85–120.

Cascade manufactures lift truck attachments at its facility at 2201 N.E. 201st Avenue, Gresham, Oregon, located southeast of the Boeing property. The Cascade manufacturing facility occupies approximately 6 acres,[1] which Cascade has owned since 1956. (See Figure 1).

The Environmental Protection Agency (EPA) and the Oregon Department of Environmental Quality (DEQ) are actively involved in supervision and oversight of investigation and remediation of regional contamination. The ultimate remedial action and the extent of the remediation are controlled by these two agencies either through consent decrees or mandate.

### B. The geology and hydrogeology of the area

Both parties agree that to understand and determine the extent and sources of contamination at the site, I must first examine the geologic and hydrogeologic subsurface beneath the area. Water within geologic units below the surface of the ground is called groundwater. The flow of groundwater through geologic units is measured on a spectrum. At one end of the spectrum are aquifers, which are underground geologic layers that store and transmit water at sufficient rates to supply wells and springs. At other end of the spectrum are aquitards or confining units, which are relatively impermeable layers which inhibit, and sometimes prohibit, the flow of water through layers which surround them.

Groundwater moves through units from areas with high groundwater levels to those with lower groundwater levels, which generally means in a downward direction. The direction and rate at which groundwater

---

1. Cascade owns approximately 45 acres in the vicinity. For the purposes of this dispute, however, the manufacturing facility is the only relevant property.

moves between geologic units is influenced by the capacity of each layer to allow water to pass through the layer[2] and the layer's thickness, the hydraulic gradient,[3] and the amount of interconnected pore space within each layer.[4]

As illustrated on Figure 2, the geology of the Boeing and Cascade properties is comprised of five primary layers. The first layer underneath the mantle of surface deposits is the Troutdale Gravel Aquifer (TGA). Underneath the TGA is CU1, an aquitard comprised of silt and clay which inhibits downward flow from the TGA into the layers below. The third layer, beneath CU1, is the Troutdale Sandstone Aquifer (TSA), which consists of two distinct sub-layers: the TSA-sandstone (upper) and the TSA-conglomerate (lower). The TSA-sandstone has a fairly uniform grain size, while the TSA-conglomerate consists of rock with a wide variation in grain size. While these two sub-layers of the TSA are distinct, they are not separated by a confining unit and, therefore, function as one unit. The fourth layer, Confining Unit 2 (CU2), is another aquitard. The fifth layer is the Sand and Gravel Aquifer (SGA).[5]

Historically, the area has been subjected to erosion and other stresses, which has resulted in geologic layers of varying thickness and permeability. In addition, the individual layers often contain "lenses" or isolated anomalies within them. These lenses or zones within layers often have lower conductivity than the layer as a whole, and water which moves into a low conductivity zone will sometimes "perch" on that zone. Water moves laterally along the perched zones, eventually working its way over the edge of the lens and down to the aquifer below. (See Figure 3.)

Erosion and geologic stresses have completely removed the TGA and CU1 in some areas, leaving the TSA as the first level aquifer directly beneath the surface deposits. North of the Cascade property and through the northeastern portion of the Boeing property, CU1 narrows to nonexistence. Over the northeast portion of the Boeing property and north of the Cascade property, CU1 terminates at a line called the truncation. (See Figure 4).

Because groundwater in this area generally flows northward toward the Columbia River, water flowing north from the Cascade property in the TGA that reaches the truncation flows over the edge of CU1 and directly into the TSA. In addition, some easterly/northeasterly flow of groundwater in the TGA from the Boeing site may also pour over the edge of CU1 into the TSA.

As water flows over the truncation into the TSA at the Cascade site, it encounters a structural high[6] which causes a groundwater mound in the TSA.[7] (See Figure 5). Groundwater escapes the mound by flowing outward radially, first moving south, then splitting into two separate pathways, one pathway flowing northeasterly, away from the Boeing property, then northerly, and the other pathway flowing northwesterly, under the Boeing property and then northerly. (See Figure 5a). These flow patterns enable the parties to divide the plume into several sections. Boeing acknowledges that it is responsible for the westernmost section of the plume, and Cascade acknowledges responsibility for the easternmost section of the plume. The central portion of the plume is the area of dispute for allocation purposes.

2. The capacity of a layer to allow water to pass through it is called conductivity.

3. The significance of a downward hydraulic gradient is that it provides a driving force for water to move through the soil. Typically, gradients are greater where an unsaturated zone exists beneath a saturated aquifer.

4. The measure of interconnected pore space within an aquifer is called effective porosity.

5. Northeast of both the Boeing and Cascade sites, a fourth aquifer, the Blue Lake Aquifer (BLA), also exists. The BLA does not extend beneath either party's property and is only tangentially involved in this case.

6. The structural high is an underground hill which formed through folding, erosion and faulting.

7. The rock within the structural high has a low transmissivity. (Transmissivity is the measure of a layer's capacity to transmit water, and is determined by multiplying the conductivity of a layer by its thickness.) Because more water pours over the truncation than can escape from the structural high, a "mound" of water results.

Resolution requires an examination of the sources, quantity, and nature of groundwater flow from each property into the TSA.

As shown in Figure 4, two surface springs flow from the TGA as it approaches the edge of the CU1 truncation: Taggart Spring and Shepard Spring. Taggart Spring is located south of the CU1 truncation, but north of the Cascade property, and Shepard Spring is east of Taggart Spring, north of the Cascade property and just north of the CU1 truncation. The Taggart Spring flow is currently diverted into a storm sewer, to reduce overall flow into the mound, and thus contaminant distribution, north of the Cascade property. Thus, Taggart Spring is not a significant ongoing source of contamination to the TSA, although Shepard Spring continues to flow into the TSA.

The Boeing property contains a subsurface geologic trough, which runs north/south through the Boeing property in the area of the 85–001 building. The trough exists only in the TSA[8], and operates as an effective groundwater divide during non-pumping conditions. Groundwater west of the trough is contaminated solely by Boeing, while groundwater east of the trough carries contaminants from Cascade and possibly from that portion of the Boeing property east of the trough. Boeing's expert, Dr. Henry Landau, testified that pumping from the City of Portland and/or the Rockwood wells may have pulled some of the plume, and thus the contaminants in the plume, across the groundwater trough, but he could not be certain of this or quantify the amount of contamination which had crossed the trough. Therefore, he does not attribute any of the contaminant mass west of the trough to Cascade.

The groundwater flow in the area is influenced by external forces as well as the natural and preferred pathways in the geologic layers. For instance, a well located in the area, when pumping, has a radius of influence which operates to "pull" water towards the well. The more water pumped from the well, the greater the influence on the flow of groundwater in the surrounding area. The corresponding "drawdown" in water levels when pumping occurs may cause changes in groundwater gradients.

North of the Boeing and Cascade properties, the City of Portland operates a wellfield which serves as a supplemental metropolitan water supply. When in use, the City of Portland wells draw nearly 60,000 gallons per minute (gpm) from the aquifers in the region, including the BLA, and exert a groundwater influence of over two miles. For example, during periods when the City of Portland wells are pumping, the water level in the TSA declined in Boeing's well A–2 by as much as twenty-four feet. Northwest of the Boeing property lies the Rockwood Well District which supplied water to a local water district. The Rockwood wells, when operating, drew 1,800 gpm from regional aquifers. During periods when the Rockwood wells were active, well A–2 showed a decrease in water level of up to four feet. Finally, Boeing's pump and treat system, which began operating in March 1989, draws water from the TGA. The primary effect of the pump and treat system has been to alter the downward gradient which previously existed over much of the Boeing property. When active, the pump and treat system reverses the gradient, resulting in an upward gradient over the western portion of the Boeing property.[9] The upward gradient tends to inhibit downward flow of contaminants from the TGA to the TSA.

## C. The plume

Both the TGA and the TSA are contaminated. The parties are individually remediating the contamination in the TGA at their respective properties, and neither party seeks contribution for these costs. Contamination from the TGA has migrated to the TSA by flowing over the truncation, as discussed above, and by passing through fractures or other pathways in CU1[10] where a

8. The trough is not evident in the TGA.

9. A downward gradient continues to exist over the eastern side of the Boeing property.

10. Fractures can be natural pathways, including fissures, slickinsides, and punctures caused by roots or burrowing animals. Examples of human-made pathways are bore holes and well casings.

downward gradient exists. Through the natural groundwater flow patterns, as well as external forces, contamination which has migrated from the TGA to the TSA has caused the plume described above, which extends far beyond the parties' respective properties. Further, contamination in the TSA has to some extent migrated through CU2 and has probably affected the SGA and may affect the BLA. The migration could ultimately affect the City of Portland wells and other wells in the vicinity.

It is the TSA contaminant plume which is the subject of this litigation. (Boeing's diagrams of the plume are included as Figures 6 and 8; Cascade's as Figures 7 and 9.) The contaminant plume in the TSA is located generally north of the Cascade property, and extends both northeast and northwest of Cascade, with the northwest portion of the plume extending under part of the Boeing property. The plume is configured somewhat differently in the two layers of the TSA. The TSA-sandstone plume contains an unsaturated area caused by the structural high, which causes the plume in the TSA-sandstone to have a curved shape resembling two separate "arms." The TSA-conglomerate layer is fully saturated and the plume in this layer is not separated into arms.

The eastern portion of the plume contains groundwater and contaminants that have flowed north from the Cascade property, over the truncation in the TGA to the TSA, and radiated northeasterly from the groundwater mound as a result of the conditions described above. As stated previously, the parties agree that the eastern portion of the plume is solely attributable to Cascade, while the westernmost portion of the plume, that portion west of the trough, is solely attributable to sources located on the Boeing property.

Between these two divisible portions of the plume is an area which may contain contaminants from both Boeing and Cascade. (See Figures 6–9). Cascade's contribution stems from contaminants which emanate north-westerly in the TSA after flowing westerly and northward from the groundwater mound north of the Cascade property. Boeing may also contribute by an easterly flow over the edge of the truncation into the TSA and/or through well shafts or fractures in CU1. The mixed portion of the plume is the crux of the dispute between the parties over the division of the overall mass of the contaminants; Boeing contends that its contribution to the mixed portion is de minimis, and that Cascade is primarily responsible for the mixed portion of the plume. Cascade does not deny its responsibility for a portion of the plume, but contends that Boeing is responsible for a significant amount of the contamination in the mixed portion of the plume.

## D. The contaminants

The contaminants in the plume are chlorinated solvents, which are and have been used at both the Cascade and Boeing properties. Chlorinated solvents are in a class of chemicals called volatile organic compounds (VOCs). VOCs are the most common class of contaminants in drinking water because of their use in a variety of industries, including farm and household use. VOCs share a number of common properties, including high toxicity, low solubility in water, and high mobility in the environment. Although VOCs do not dissolve readily, the portion which does dissolve moves with the groundwater, at a rate slightly slower than the surrounding water.[11] VOCs tend to diffuse through groundwater in large plumes, and remediation of various VOCs is similar.

The major contaminants in the TSA plume are trichloroethene (TCE), 1,2–dichloroethene (1,2–DCE) and perchloroethene or tetrachloroethene (PCE). Also present in the TSA, although in lesser concentrations, are

11. Contaminants move in groundwater by one of a number of processes. Significant migration processes in the TSA include advection, dispersion, and sorption. Advection, the dominant process in the TSA, occurs when a contaminant enters groundwater at one location in a certain concentration, and moves with the groundwater at the same speed and in the same concentration as it did upon originally entering the aquifer, and does not appreciably dissipate. A contaminant moves by dispersion if it moves with the groundwater but spreads out both laterally and longitudinally, with the flow of groundwater. Finally, sorption causes the dissolved contaminant to move from the groundwater to the soil by affinity to the soil particles or other processes.

1,1,1–trichloroethane (TCA), 1,1–dichloroethene (1,1–DCE) and Freon. Some of the detected contaminants are degradates [12] of VOCs rather than those actually used in industry.

VOC contamination in the plume may also be found in the form of dense, non-aqueous phase liquid (DNAPL). The science of DNAPLs has developed largely within the last six to eight years, and represents a considerable challenge in designing and implementing groundwater remediation system. DNAPL is made up of a VOC in pure phase,[13] which migrates through aquifers, undissolved, until it encounters an impermeable surface, where the DNAPL pools. Over time, tiny portions of the DNAPL pool dissolve into the surrounding water, serving as a continuous source of contamination. DNAPL is extremely difficult to locate, and is more often assumed than actually found. The presence of consistently high concentrations of contaminants is considered evidence of DNAPL; concentrations at or greater than 10,000 parts per billion (ppb) fall within EPA guidelines for the presence of DNAPL. Concentrations of VOCs in the TGA have, at times, approached and exceeded the EPA guidelines for the presence of DNAPL. The concentrations found in the TSA, however, have not approached EPA guideline concentrations for DNAPL.

Both parties have submitted extensive evidence regarding solvent use and disposal at each facility. To summarize, Boeing and its predecessors operated a number of vapor degreasers which used TCE until 1980. After 1980, Boeing used TCA as its primary degreaser solvent. Boeing and its predecessors stored waste solvents in storage tanks and dumped them onto the ground. Boeing has identified a number of source areas, in-

cluding wells A–1 and A–2, former degreaser locations, areas around the edge of the parking lots, and areas where barrels were buried, as contributors to the TGA plume at the Boeing site. Six primary contaminants are evident in the TGA at the Boeing property: TCE, TCA, 1,2–DCE, 1,1–DCE, PCE and Freon. Evidence based on present estimates indicates that the original contaminant mass in the TGA at Boeing was approximately 4500 pounds, and that 2560 pounds have been extracted from the mass, leaving approximately 2046 pounds in the TGA.

Cascade's vapor degreaser used TCE from 1961 until 1975. After 1975, Cascade used other, non-chlorinated solvents in its degreaser. Cascade stored waste solvents in storage tanks and, like Boeing, anecdotal evidence indicates that significant quantities of waste solvents were dumped onto the ground at the Cascade facility. Cascade's source areas, which constitute the primary sources of contaminants in the TGA at the Cascade property, are identified as the area near where the underground storage tanks were located, the boathouse ditch, and the area around the north loading dock. Three primary contaminants are present in the TGA at the Cascade property: TCE, 1,2–DCE, and PCE.[14] Based on present estimates, the evidence at trial indicates that the original contaminant mass in the TGA at Cascade was approximately 1,000 pounds, and that 277 pounds have been extracted from the mass, leaving approximately 750 pounds in the TGA.

### E. The Boeing investigation

Boeing discovered TCE contamination in the TGA in 1985 during the installation of monitoring wells.[15] Because Boeing was un-

---

12. A degradate is a breakdown product of a chemical exposed to environmental influences. 1,2–DCE and 1,1–DCE are degradates.

13. Most VOCs are used in extremely diluted solutions; DNAPLs result from the use of solvents which are often 95% pure.

14. TCA, 1,1–DCE, and other VOCs have also been detected in the TGA at Cascade, but infrequently and in low concentrations.

15. Until approximately 1984, the operators of the Boeing property used a surface water impoundment lagoon (the lagoon) for storing rinse water before its being pumped into a treatment facility. The lagoon was lined with two impervious liners; instrumentation between the two liners detected leaks.

The lagoon was not intended or designed to hold chlorinated solvents. In November 1983, the first liner in the lagoon leaked. Boeing determined that TCA, improperly disposed of in the lagoon, had eaten a hole in the first liner. In

certain as to whether the contamination was in an aquifer or perched in the soil, Boeing sampled its wells in January and February 1986 to determine the extent and source of contamination. Boeing received the test results in April 1986, and learned that contamination existed in other wells on its property. In late April 1986, Boeing sampled its on-site production well A–1, and learned that it contained TCE. Boeing immediately ceased using well A–1 to supply drinking water to the plant, and switched to water from the Rockwood Well District. Boeing immediately notified DEQ and the National Response Center of the results of these tests.

On July 21, 1986, Boeing signed a Consent Order with EPA (1986 Consent Order), which required that Boeing supply drinking water to affected residents of the area if contaminants in local wells exceeded the federal drinking water standards and if the Boeing site was determined to be the cause of the contamination. The 1986 Consent Order also established two investigatory phases. Phase I required that Boeing assess the extent of the contamination at its property, develop an understanding of the geology and hydrogeology of its property, evaluate the effects of pumping from regional well fields on the contamination, identify potential sources of contamination, and assess the need for source control. Phase II focused on off-site TGA contamination.

Pursuant to the Consent Order, Boeing installed various monitoring wells, sampled groundwater and soil gas, and conducted pump and tracer tests to determine the sources and extent of the contamination. Boeing used geophysical methods, including gamma logging, to analyze layers of the subsurface. Boeing also conducted pump tests to determine the interaction and communication between the TGA and the TSA. Boeing's initial investigation indicated that well A–2, located near the south edge of its property, was not a pathway by which contamination could move from the TGA to the TSA.[16] Boeing continued to monitor A–2, however, and noted that while the City of Portland wells were pumping, TCE concentrations in A–2 increased dramatically.

Boeing conducted a special investigation in the southeast corner of its property to determine the source of contaminants in that area. Boeing installed sixteen additional monitoring wells, and took soil samples and samples of CU1. This information, combined with the groundwater flow data, indicated that an offsite source was the cause of contamination in the southeast corner of Boeing's property.

With the permission of the EPA and the DEQ, Boeing instituted several "initial corrective actions" (ICAs) to begin remediation of the contamination at its property. In July 1988, Boeing sealed well A–2 to prevent possible migration of contaminants from the TGA to the TSA through the well casing and bore hole.[17] Although Boeing's investigation did not conclusively eliminate the possibility that A–2 was a pathway for contaminants to move from the TGA to the TSA, continuing contamination in the area of A–2 convinced Boeing to take steps to ensure that A–2 was not an open pathway. In March 1989, Boeing began operating a groundwater extraction and treatment system (pump and treat system) to prevent off-site migration of contaminants in the TGA. Extraction wells were installed to bring water from the TGA to the surface where it is subjected to an airstripping process.[18] The treated water is discharged into a slough. Finally, in July

early 1984 the liner was repaired and use of the lagoon resumed. In April 1984, the first liner in the lagoon leaked again, and Boeing shut down the lagoon. In March 1985, Boeing began decommissioning the lagoon and, as part of the decommissioning process, installed five monitoring wells around the area of the lagoon. These monitoring wells extended into the TGA.

16. Well A–2 supplied water to the Boeing facility from 1964–1976. In 1976, Boeing drilled well A–1 and stopped using well A–2 to supply water to the facility.

17. The wells were sealed by punching holes in the liner of the well, then filling the well casing with grout.

18. Airstripping removes VOCs from contaminated groundwater. The water is placed into a container, and air is injected into the bottom of the container. As the air rises through the water, it strips off the VOCs. The contaminated air is then either emitted to the atmosphere or subjected to further treatment, depending on the concentration of VOCs in the air.

1990, Boeing sealed the production well and a second unused well of the Rockwood Water District to prevent contamination flowing northwards from the Boeing property from reaching and contaminating the Rockwood wells. Boeing's investigation indicated that the operation of the Rockwood wells served to pull the plume of contaminants on the Boeing property northwards towards the Rockwood wells. By sealing the wells, Boeing sought to prevent contamination from reaching those wells. Boeing also excavated contaminated soil and removed it from its property.

At the EPA's direction, Boeing conducted a Phase II investigation which focused on off-site TGA contamination. Among other actions, Boeing installed 19 monitoring wells and six piezometers,[19] and evaluated the efficacy of the pump and treat system previously installed in the TGA. In April of 1990, the 1986 Consent Order was amended to decrease the area in which Boeing was required to sample wells and provide alternate water. DEQ assumed responsibility for providing water to people with wells contaminated from sources other than the Boeing property.

In 1994, Boeing entered into a second Consent Order with EPA under which Boeing continued to investigate TSA contamination. Boeing's Phase III investigation including coring and sampling of CU1, further investigation of contaminant pathways, and further investigation of source areas at the Boeing property. During the summer of 1995, Boeing submitted a Facility Investigation Report that provided investigation results to EPA. EPA approved the report in August 1995.

### F. The Cascade investigation

Cascade learned of contamination in its industrial supply well in 1986. Cascade tested the industrial supply well from May 1986 until March 1988, and sent the test results to DEQ. Early in 1988, DEQ informed Cascade that further testing was unnecessary, and Cascade ceased routine testing of the well.

In 1987, Cascade's waste hauler requested that waste in the Cascade's underground storage tanks (USTs) be tested for identification purposes. Although the tanks were intended only for the storage of waste oil and coolants, the 1987 analysis showed the presence of TCE and other VOCs in the tanks. In 1988, Cascade decommissioned the USTs. Due to the appearance of oil in the excavated pit, Cascade notified DEQ, and DEQ directed that the USTs be removed.[20] DEQ also directed that soil and water with visible oil contamination be removed and tested.

The tests of the water and soil from the pit showed VOC contamination. Cascade removed the contaminated soil from the pit and disposed of it off-site, along with the USTs. Pursuant to the contamination discovered when soil and water from the pit was tested, Cascade entered into a Consent Order with DEQ in July 1988 which required Cascade to evaluate source areas and the extent of contamination at its site. Under Cascade's 1988 Consent Order, Cascade conducted an investigation into the geology and hydrogeology of the property and potential sources of contamination. Cascade drilled a number of TGA wells and TSA wells, analyzed the spring flow and water quality at Taggart Spring and Shepard Spring, installed additional wells, took soil vapor samples at some 40 locations, explored test pits around the UST removal area, and installed a pilot trench for an interim recovery system. The investigation conducted by Cascade indicated that the three primary sources of TGA contamination at the Cascade site were the areas around the former USTs, the boathouse ditch, and possible incidental releases near the north loading dock of the facility.

Cascade's 1988 Consent Order allowed the implementation of interim measures with the approval of DEQ. First, Cascade decommissioned its industrial supply well upon discovery of a hole in the steel casing of the well which allowed contamination from the TGA to migrate to the TSA.[21] Through a packer

---

19. A piezometer measures water levels.

20. Initially, Cascade intended to remove the sludge from the tanks, and replace it with a cement slurry rather than remove the tanks.

21. From 1964 to 1991, Cascade used an industrial supply well located near the western wall of the building; in 1986 the well was found to be contaminated with VOCs. Cascade discovered a

test, Cascade confirmed that contaminated water from the TGA was entering the TSA through the well. Cascade sealed the well by perforating the well casing and filling the hole with a cement slurry.

Cascade installed a groundwater extraction system in 1991 and 1992. The Cascade extraction system consisted of three extraction wells in the TGA along the northern boundary of the Cascade property. A nearby monitoring well was added to the extraction system in 1994. These wells pump water from the TGA to the surface, where VOCs are removed through air stripping.

In the summer of 1994, Cascade installed an interceptor trench extending into CU1 north of its property to eliminate the flow of contaminants from the TGA to the TSA over the truncation. The trench was initially installed as a pilot study to determine whether contaminated TGA flow could be diverted and treated prior to pouring over the truncation and into the TSA. In July and August 1995, the recovery trench was expanded to approximately 400 feet in length. The trench has been in full operation since October 1995.

### G. Joint Boeing and Cascade Actions

Boeing and Cascade began working together on the East Multnomah County Technical Advisory Committee in 1989. As the lead agency for supervision over the contamination in the TSA, DEQ also participated on this committee.

In 1992, DEQ issued a Master Plan establishing the requirements for investigation and cleanup of contamination in the TSA. The Master Plan instructed the parties to work cooperatively on the contaminant plume. After the 1992 Master Plan, Boeing and Cascade entered into a joint Consent Order (1993 Consent Order), which directed the parties to control the contaminant plume in the TSA and obtain additional information

on that aquifer in order to protect the city of Portland's water supply.

Pursuant to the 1993 Consent Order, Boeing and Cascade have cooperatively conducted an investigation and analysis of the TSA plume.[22] The parties have also installed resource protection wells, which were placed to counter or overcome the hydraulic effect exerted on the plume during City of Portland pumping. Boeing installed RPW-2; Cascade installed RPW-1.

In 1994, DEQ prepared an addendum to the 1993 Consent Order, requiring further investigation of the TSA, as well as the preparation of a joint Remedial Investigation and Feasibility Study. Under the terms of the addendum, Boeing and Cascade jointly completed a remedial investigation and submitted the appropriate preliminary reports. Boeing and Cascade were unable to agree on a final Feasibility Study (FS); each party submitted their own FS to DEQ in the fall of 1995. Under a memorandum of understanding between DEQ and EPA, DEQ will select the final remedy for the TSA from the options in the FS reports.

### III. DISCUSSION

#### A. Legal Framework

CERCLA provides two forms of legal action by which parties may recoup some or all of their costs associated with the cleanup of hazardous waste: cost recovery actions under 42 U.S.C. § 9607(a) (CERCLA § 107(a)); and contribution actions under 42 U.S.C. § 9613(f) (CERCLA § 113(f)).[23] Section 107 imposes liability on responsible parties for "all costs of removal or remedial action incurred" by government entities and, if consistent with the National Contingency Plan (NCP), by private parties. 42 U.S.C. § 9607(a)(4). When interpreting this section, courts recognized an implied right of contribution where a party shoulders more than its equitable share of response costs. See Unit-

---

hole in the steel casing of the well when it was video-surveyed as part of Cascade's investigation of source areas and pathways.

**22.** Each party has, however, retained their own consultants and experts.

**23.** Oregon law provides substantially the same avenues of recovery as those described in CERCLA, with the exception that Oregon does not require that costs be incurred consistent with the NCP to be recoverable. ORS 465.255; ORS 465.325.

ed States v. CERC, 50 F.3d 1530, 1535 (10th Cir.1995) (courts recognize an implicit federal right to contribution where parties are subject to joint and several liability and have incurred response costs in excess of their pro rata share).

■ Congress codified this implied right of contribution in 1986, by enacting a new contribution section, § 113, which "clarifies and confirms the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially responsible parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances." S.Rep. No. 11, 99th Cong., 1st Sess 44 (1985). Under CERCLA, where a responsible party brings a Section 107 action, Section 113 applies. *In re Dant & Russell v. Burlington Northern R.R.*, 951 F.2d 246 (9th Cir.1991).

■ To bring a contribution action, a plaintiff must show that (1) the defendant is a liable party under CERCLA 107(a); (2) the site in question is a facility, as defined in CERCLA § 101(9); (3) there was a release or a threatened release of a hazardous substance; and (4) the release or threatened release caused plaintiff to incur response costs consistent with the NCP. *3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1358 (9th Cir.1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). *See also Kaiser Aluminum & Chemical Corp. v. Catellus Corp.,* 976 F.2d 1338, 1340 (9th Cir.1992) (under Section 113, plaintiff can seek contribution from any liable party as defined in Section 107).

■ Once liability is established, a party's share of liability is apportioned according to those equitable factors the court finds appropriate. 42 U.S.C. § 9613(f). Section 113 does not require a court to consider a particular list of factors. *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). Depending on the totality of circumstances, a court may consider many factors, a few factors, or it may find one factor determinative. *United States v. Colorado and Eastern R.R.,*

50 F.3d 1530, 1536 (10th Cir.1995) (citations omitted). Among the factors a court may consider are the "Gore factors" which include 1) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; 2) the amount of hazardous waste involved; 3) the degree of toxicity of the hazardous waste; 4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; 5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and 6) the degree of cooperation by the parties with Federal, state or local officials to prevent any harm to the public health or the environment.[24] H.R.Rep. No. 253, 99th Cong., 1st Sess. 19 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 3042. The Gore factors are neither exhaustive nor exclusive. *CERC,* 50 F.3d at 1536 n. 5.

■ Recoverable costs must be both necessary and consistent with the NCP. 42 U.S.C. § 9607(a)(4)(B). *See also Washington State Dept. of Transp. v. Washington Natural Gas Co.,* 59 F.3d 793, 799 (9th Cir.1995) (a private party seeking response costs must prove that its actions are consistent with the NCP). The NCP regulations applicable are those in effect at the time the response costs are incurred. *Louisiana–Pacific Corp. v. ASARCO, Inc.,* 24 F.3d 1565, 1576 (9th Cir. 1994). Prior to 1990, something less than "strict compliance" was required; the 1990 plan requires only substantial compliance. *N.L. Indus. v. Kaplan,* 792 F.2d 896, 898–99 (9th Cir.1986).

Under the NCP, a private party's response costs are recoverable when its action, evaluated as a whole, is "in substantial compliance with the applicable requirements of [the NCP] and results in a CERCLA-quality clean-up." 40 C.F.R. 300.700(c)(3); *Louisiana–Pacific Corp. v. ASARCO, Inc.,* 6 F.3d 1332, 1341 (9th Cir.1993). Actions taken pursuant to the terms of an EPA consent order are consistent with the plan. 40 C.F.R. 300.700(c)(3)(ii). The "substantial compli-

---

**24.** Oregon's Chapter 465 provides for similar considerations.

ance" standard allows room for immaterial or insubstantial deviations from the provision of the plan by private parties. 40 C.F.R. 300.700(c)(4).

Under the NCP, a private party must maintain sufficient documentation to provide an accurate accounting of costs incurred for response actions. 40 C.F.R. § 300.160(a)(1). A party must provide prompt and accurate information to the public, 40 C.F.R. § 300.155(a), and to the National Response Center, 40 C.F.R. § 300.405. A party must also compile a description of releases at the site, the nature of those releases, and a descriptive history of waste handling at the site, and a description of known contaminants and sources. 40 C.F.R. § 300.420. Finally, a party must evaluate existing data and develop a conceptual understanding of the site. 40 C.F.R. § 300.430.

█ CERCLA expressly prohibits double recovery for response costs. 42 U.S.C. § 9614(b). Thus, where a plaintiff receives payments pursuant to state and/or federal law, that plaintiff is precluded from receiving compensation for the same removal costs under CERCLA. *Id. See also Price v. United States Navy*, 39 F.3d 1011, 1014 (9th Cir. 1994) (plaintiff precluded from recovering CERCLA costs where she had already received full compensation through settlement and payment from the state).

█ CERCLA also prohibits an award of future monetary damages. *In re Dant & Russell*, 951 F.2d at 250. However, CERC-LA provides for declaratory judgments to allocate liability for future response costs in Section 107 actions. 42 U.S.C. § 9613(g)(2). Although it is unclear whether declaratory judgments are also permitted under Section 113, it is well established that a CERCLA plaintiff is entitled to declaratory relief under 28 U.S.C. § 2201. *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir.1986). The relevant inquiry is whether, under the facts and circumstances alleged, there is a substantial controversy between parties with adverse legal interests

of sufficient immediacy and reality to support the issuance of a declaratory judgment. *Wickland Oil Terminals*, 792 F.2d at 893 (citations omitted). The essential facts establishing a CERCLA plaintiff's right to declaratory relief are the alleged disposal of hazardous substances at the site in question, *Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691, 696 (9th Cir. 1988), and whether the plaintiff has incurred costs for cleaning up a hazardous waste site. *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 860 F.2d 344, 345 (9th Cir.1988). In awarding declaratory judgments which allocate responsibility for future response costs, courts have considered the "elephantine carcass of . . . CERCLA litigation," and noted the waste of resources required to relitigate liability whenever subsequent response actions are taken. *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 845 (6th Cir.1994).

## IV. CONCLUSIONS OF LAW

Boeing brings this action for contribution to costs incurred through the investigation and remediation of contamination in the TSA.[25] It is undisputed that both parties are liable parties as defined by Section 107, that the site in question is a facility as defined in Section 101(9), and that there have been releases from both facilities which have caused the incurrence of response costs. Cascade disputes the fourth element required to bring a cost recovery action: whether Cascade's releases caused Boeing to incur response costs consistent with the NCP.

### A. Liability for Past Costs

█ Cascade argues that because Boeing would have incurred response costs due to its own discharges, regardless of Cascade's contribution, Cascade did not "cause" Boeing to incur costs and thus Cascade cannot be liable for those costs. In *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930 (8th Cir.1995), defendants made the same argument, con-

---

**25.** Boeing seeks recovery under Sections 107 and 113. Boeing admits, however, that it is a liable party under CERCLA. As a liable party, Boeing's action is one for contribution, not a "pure" cost recovery action. Accordingly, Boeing's action is governed by the terms and provisions of Section 113.

tending that they could not be held liable for investigatory costs because their releases were not the sole cause of plaintiff's investigation. The Eighth Circuit rejected this argument, noting that to accept such a conclusion would impose on CERCLA plaintiffs "the requirement to prove that each type of response cost was separately caused by the defendant's release." *Control Data*, 53 F.3d at 936. The Eighth Circuit held that a plain reading of the statute leads to the conclusion that once a party is a liable party under CERCLA, it is liable for its share, as determined by Section 113, of "any" and all response costs, not just those costs "caused" by its individual release. *Id.*

Cascade does not dispute that it is responsible for part of the TSA contamination under the Boeing property and is a liable party under CERCLA; it merely disputes the amount of contamination for which it should be held responsible. The simple fact that the hazardous substances released by Cascade contaminated a property which was also contaminated by another party does not excuse Cascade from partial liability for response costs incurred in investigating and remediating that contamination. Accordingly, I find that as a liable party under CERCLA, Cascade is responsible for a pro rata share of the response costs incurred by Boeing in investigating and remediating the contamination in the TSA.

**B. *Consistency with the National Contingency Plan***

Boeing may only recover those costs which were necessary and consistent with the NCP. The parties entered a stipulation that Boeing has complied with the NCP subject to Cascade's reservation of three specific objections: 1) Boeing failed to accurately account for all costs incurred for response actions; 2) Boeing failed to provide prompt and accurate information; and 3) Boeing failed to conduct an appropriate investigation of contaminant sources and migration to the TSA.

Additionally, although Cascade did not formally seek contribution, it did seek a credit

for funds it expended in remediating the TSA. Through closing arguments and trial submissions, Boeing acknowledged the validity of Cascade's request, and further agreed to the inclusion of Cascade's expenditures to the overall cost allocation. However, Boeing was unwilling to stipulate that all of Cascade's costs were necessary and incurred consistently with the NCP. Accordingly, I judge Cascade's expenditures by the same standards employed for Boeing, below.

*1. Accurate Accounting*

 Cascade contends that Boeing failed to adequately segregate TGA costs from TSA costs. Although Boeing failed to segregate TGA costs from TSA costs initially, it hired an accounting expert, Ronald Witcosky, to review and segregate those costs. Witcosky testified that he first removed from the "pool" of investigatory and remediation costs those amounts unrelated to either aquifer, including legal fees, litigation support, and construction support. Boeing employees who worked on the groundwater contamination at the Boeing property also assisted in identifying the aquifer to which costs should be attributed. Next, Witcosky eliminated from the pool costs which were unique and specific to the TGA. Witcosky then identified costs directly attributable to the TSA, which included the costs associated with the drilling of wells into the TSA, the collection of water samples from those wells, the analytical testing of those samples, and the abandonment of the Rockwood Wells.[26] Remaining in the pool then was a collection of costs which, though not directly attributable to either the TGA or the TSA, reflected investigatory and remediation costs at the Boeing property.

Witcosky then allocated these costs by combining two different means of analysis. First, he divided the number of TSA wells drilled and sampled by the total number of TGA, TSA and other wells at the site, which led to an allocation of non-direct costs of 38.3% to the TSA. Second, Witcosky considered the total number of samples taken from

---

**26.** The direct TSA costs identified by Witcosky were the joint DEQ investigation, $2,755,416; well drilling, $723,444; analytical testing, $220,-

957; collecting samples, $77,740; and the Rockwood Well Abandonment, $454,077.

both TGA and TSA wells against the number of samples taken from TSA wells, which led to an allocation of non-direct costs of 30.1% to the TSA. Witcosky then averaged the two percentages to conclude that 34.2% of Boeing's non-direct costs were attributable to the TSA investigation and remediation.[27] Witcosky's calculations yielded a total of $6,216,459 for Boeing's TSA costs, plus $1,043,262 in pre-judgment interest, for a total of $7,259,721.

At trial, Boeing presented voluminous documentation of each and every invoice referencing the investigation and remediation related to contamination at the Boeing property, hours billed and services performed by external consultants and Boeing employees, and costs of well drilling, sampling and monitoring. Further, although Boeing did not bill costs incurred on each aquifer separately, I find that Witcosky's analysis constitutes an accurate and adequate means of allocation. While perhaps less than perfect, Boeing's documentation provides an accurate accounting of incurred costs.

Both Boeing and Cascade raise legitimate questions as to the methods each party used to allocate costs between aquifers. Both parties understandably question the efficiency of each other's response actions, the skills and costs of their consultants, and their internal costs. However, all of this must be viewed with a historical perspective, and with the understanding that we now have the benefit of hindsight.

I am convinced that when the parties discovered contamination on their respective properties, neither knew of the other's involvement, nor did they have the slightest inkling of the scope and magnitude of the problem or the ultimate costs which would result. Therefore, it is not surprising that neither party established an accounting system adequate to address the magnitude of the situation. Once this dispute emerged, however, both parties found themselves faced with the need to justify and explain each and every one of their individually incurred expenses. While I had areas of doubt about the accuracy of some accounts, and while both parties admitted difficulties in completely eliminating non-TSA costs from their figures, I am satisfied that the figures submitted by both parties are quite accurate. Further, to the extent inaccuracies exist, I am convinced that they counterbalance each other. Therefore, I find that Boeing has complied with both the 1985 and 1990 NCP requirements of accurate accounting.[28] I similarly find that Cascade has complied with the appropriate NCP requirements.

### 2. Information and Investigation

Cascade further alleges that Boeing failed to provide prompt and accurate information about the site to the public and to the NRC as required by the NCP, failed to adequately investigate the history and nature of releases at its property, and failed to adequately investigate contaminant sources and migration pathways. Cascade points to a number of early reports by Boeing regarding waste handling and disposal at the Boeing property, Boeing's continued resistance to the idea that CU1 was an ineffective aquitard, Boeing's contentions regarding its supply wells, and Boeing's investigation of DNAPL.

Boeing introduced evidence at trial regarding the discovery of contamination on its property in 1986, and the notification of employees, the media, and NRC of the contamination. Reports included in Boeing's trial submissions substantiate its prompt investigation of contamination on its property, early attempts to identify source areas and waste disposal practices at the site, and ongoing efforts to analyze and characterize the geology and hydrogeology of the site. The reports grow increasingly more detailed through the years as Boeing's investigation

27. Non-direct costs of $1,984,825 were attributed to the TSA, and included in the figure used for allocation.

28. Boeing did not argue that its costs were incurred pursuant to consent orders issued by EPA and thus entitled to a finding of consistency under 40 C.F.R. 300.700(c)(3)(ii). However, I note that this regulation provides a viable alternative basis for cost approval. *See United States v. CERC*, 50 F.3d at 1536 (affirming district court finding that incurred costs were consistent with the NCP based on trial testimony and 40 C.F.R. 300.700(c)(3)(ii)).

progressed and contain vast information regarding waste disposal and handling practices at the Boeing property, source areas, potential contamination pathways including Boeing's supply wells, assessments of CU1's structural integrity, discussions of DNAPL, an analysis of the truncation, and other topics pertinent to the investigation and remediation of the site. The sheer quantity and complexity of information gathered by Boeing and its consultants, supplemented and explained by the witnesses at trial, leads me to the inevitable conclusion that Boeing has complied with the NCP requirements for information gathering, investigation, and presentation to the public and NRC. Cascade's allegations of Boeing's deficiencies lack merit,[29] and plaintiff has met the four factor test to maintain a contribution action.

## C. Cost Allocation

Having passed the Section 113 threshold, I must now apply the contribution provision of Section 113 to allocate those costs incurred by both parties in remediating the TSA plume. Section 113 permits application of the equitable factors which I find to be most appropriate to the circumstances of the case.

### 1. Mass

■■■ Boeing contends that I should allocate remediation costs by reference to the mass of the contamination plume. Landau testified that such a method is particularly appropriate here since the chemicals dumped by both parties have functionally identical toxicity levels. Further, Landau believes that mass most effectively evinces each party's contribution to the plume.

Because of the different configurations of the TSA plume in the conglomerate and sandstone layers, Landau calculated the mass of contaminants in each layer of the TSA plume separately. For each layer, Landau divided the plume into several hundred uniformly sized subsections of a three-dimensional grid, which he called "prisms." For each prism, Landau determined the mass of contaminants by examining the saturated thickness,[30] the length and width, the concentration of contaminants,[31] and the porosity of the soil.[32] The resulting number was subjected to a conversion factor, which produced a pound figure for the mass of contaminants in each prism. The pound weight in each prism of each layer of the plume was added together to arrive at a total mass of contaminants in the plume.

After calculating the total mass of the plume, Landau used groundwater flow data, chemical data and other factors to divide the plume between Boeing and Cascade. Landau's analysis allocates 18% of the plume to Boeing and 82% to Cascade. Landau then rounded the numbers to a 20/80 division.

Cascade does not dispute Landau's methodology in calculating the total mass of contaminants in the TSA plume, and the parties agree in large measure as to the size, shape, and extent of contamination within the plume. The parties also agree that the east side of the plume is attributable to Cascade, and the west side of the plume is attributable to Boeing. Instead, the point of Cascade's argument is that mass is an inappropriate allocation tool because investigatory costs are more directly driven by such factors as the geologic and hydrogeologic setting, the nature and distribution of the contaminants, different pumping stresses, and the different phases of the plume contaminants. As to future costs, Cascade argues that mass is inappropriate because costs are more affected by the permeability of the contaminated

29. I note that Boeing raises these same contentions regarding Cascade's investigation and remediation, and I find Boeing's claims similarly without merit.

30. The saturated thickness of each prism, or the amount of each prism that was fully saturated with water, was determined using hydrogeologic data, including groundwater contours from surrounding wells.

31. To determine the amount of contamination within each prism, Landau used groundwater quality data from surrounding TSA monitoring well to calculate an average concentration of contaminants for each prism.

32. By calculating the total amount of space in the soil, and then determining the amount of that space which is occupied by water, Landau reached a porosity of approximately ⅓ for the TSA-sandstone, and approximately ¼ for the TSA-conglomerate.

aquifer, the thickness of the aquifer, the hydraulic gradient, the complexity of the hydrogeologic setting, the concentration of contaminants and the volume of water to be treated.

Cascade correctly argues that factors other than mass directly impact the amount of costs incurred to remediate the aquifer. However, none of these factors affect, or should affect, the allocation of those costs, because liability is established by contribution to the harm, not the solution. I find that the respective harm to the environment caused by Boeing and Cascade is best reflected by the mass of contaminants each contributed to the TSA plume. Further, when the parties disagree over only a small portion of the plume, the use of mass to find a percentage, and the 80/20 allocation proposed by Landau, are appropriate starting points for allocating responsibility for costs incurred to investigate and remediate the TSA.

### 2. Gore Factors

■ Boeing cites the fact that its property was contaminated prior to Boeing's purchase, and that Boeing did not further contaminate the property, as relevant considerations. Boeing also cites its own extensive cooperation with environmental officials, and raises questions regarding the level of cooperation exhibited by Cascade. Most importantly, Boeing relies on Landau's estimate that its contribution to the plume constitutes 20%, based on hydrogeologic, geologic, and chemical data.

Cascade disputes Boeing's role with respect to contamination at the Boeing property, contending that Boeing was significantly involved in the operation of its property prior to its purchase. Cascade claims to have been cooperative and responsive to environmental authorities, and argues that Boeing has not. Finally, Cascade agrees that its contribution to the plume is distinguishable, but argues that Boeing's contribution to the TSA plume is more significant than Boeing is willing to acknowledge.

Most of the Gore factors, unfortunately, fail to assist in this case. Because much of the contamination of the TSA occurred many years prior to the imposition of legal requirements for the handling and disposal of hazardous waste, the amount of hazardous waste each party contributed to the TSA plume is extremely difficult to quantify. The contamination contributed by each party to the TSA plume is of the same toxicity, which does not weigh in favor of (or against) either party. The parties or their predecessors were both involved in the use and disposal of the hazardous materials. Both parties exercised the degree of care which was characteristic of the time with respect to the hazardous substances; disposal of solvents onto the ground during the 1960s and 1970s was neither illegal nor uncommon.

That the parties proceeded separately, and established independent relationships with the regulatory agencies, and undertook distinct remedial actions and investigations, does not mean that they were not adequately cooperative or responsive to environmental authorities. It is also entirely understandable that each party would be skeptical of information gathered by the other, and that the parties would move with great caution to avoid assuming responsibility for a plume which they did not believe to be of their making. Through evidence presented at trial, and submitted in voluminous exhibits, I am convinced that the parties have been continuously, actively, and responsibly involved in investigation and remediation of the TSA contamination, as evidenced in part by their prompt entry into Consent Orders with the appropriate agencies.

The only Gore factor remaining is the ability of the parties to demonstrate that their contribution to the TSA plume can be distinguished. I find that this is a significant factor relevant to this case. To apply it, I must carefully examine Boeing's claim that its contribution to the plume is limited to 20% of the total mass in the plume. Cascade argues that Boeing's contribution is more than 20% because of (a) contaminant flow through CU1 at the Boeing property; and (b) easterly flow of contaminants at the Boeing property through the truncation. Attempting to understand and interpret the geologic and hydrogeologic information presented by the parties on these issues made

me appreciate those times when I can hand factual issues to a jury.

### a. *Flow through CU1*

Landau identified CU1 as one layer of a four-layer subunit, which he called Subunit 1. Dr. Landau testified that the four layers of Subunit 1 (Subunits A, B, C, and D) have varying degrees of efficacy as aquitards, that is, they vary in their ability to prevent the migration of groundwater from the TGA to the TSA. There is no dispute that of the four subunits, Subunit B is the most efficient aquitard within Subunit 1. Subunit B varies between 10–20 feet in thickness and averages 12–15 feet in thickness across the Boeing property. All of the subunits within Subunit 1 become thinner near the truncation. The average thickness of Subunit 1 across the Boeing property is approximately 40 feet.

Dr. Landau opined that Subunit B effectively prevents the migration of contaminants from the TGA to the TSA for the following reasons. First, core samples of CU1 showed no extensive or continuous fracturing (except for some areas near the truncation), and thus it is unlikely that fractures in CU1 allow significant amounts of contamination to move from the TGA to the TSA. Second, pump tests of the TSA performed on the Boeing property revealed little changes in the potentiometric surface of the TGA.[33] This absence of a reaction in the upper aquifer when the lower aquifer is pumped indicates low conductivity through CU1. Third, chemical analysis of the TSA revealed no sign of the TGA's chemical fingerprint.[34] Fourth, the two prior pathways for contaminants to enter the TSA from the Boeing property, wells A–1 and A–2, were effectively eliminated in 1988–1989.[35] Landau also believes that each subunit within Subunit 1 should be factored into any travel time calculation.[36] Under Lan-

dau's analysis, it could take approximately 40 years for a contaminant to move from the TGA through Subunit 1 and into the TSA. If Landau's analysis is accepted, it is more likely that the migration of contaminants from the Boeing property would not constitute a significant source of contamination of the TSA.

Landau and defense expert Dorothy Atwood agree that any contaminant pathways created by wells A–1 and A–2 are currently non-existent. However, Atwood disagrees with Landau's conclusion that Subunit B effectively prevents the flow of contaminants from the TGA to the TSA. First, Atwood considers Subunits A, C, and D ineffective and would exclude them from travel time calculations. Second, Atwood believes the hydraulic gradient over the eastern portion of the Boeing property significantly lowers travel times. Third, Atwood believes that Boeing's field notes reveal that CU1 has highly variable properties, and in some areas functions as more of an aquifer than an aquitard. Fourth, Atwood disagrees with Landau's conclusions regarding the significance of fracturing in CU1, and believes that the fracturing provides an effective pathway for contaminants to move from the TGA to the TSA. Finally, Atwood would disregard pump test results because one of the aquifers is unconfined which could lead to an inaccurate measure of interaction between aquifers. Under Atwood's analysis, contaminants can travel through CU1 in 3 to 16 years and thus, it is more likely that Boeing's operations have had a greater impact on TSA contamination.

Dr. Landau agreed that near the truncation at the Boeing property, some fracturing of CU1 was observed, and that depending on the hydraulic gradient, travel times could be

---

33. Potentiometric surface is the measure of the water level in a confined aquifer.

34. According to Dr. Landau, the absence of significant concentrations of the three "marker" VOCs from the Boeing property—TCA, 1,1–DCE, and Freon—from the TSA contamination at the Boeing property indicates that flow through CU1 is an insignificant or non-existent source of contamination at the Boeing property.

35. Boeing sealed off well A–2 in July of 1988. Well A–1 currently exists in an area with an upward gradient and has been determined to be a self-remediating well which does not allow the downward migration of contaminants into the TSA.

36. Landau combined the conductivity of each layer, weighted by the relative thickness of each layer, to reach an average conductivity for the entire subunit.

less than those calculated. He also acknowledged the presence of TCA in the perched TSA east of the truncation, and noted that the gradients in the area east of the truncation indicated that TCA in the perched TSA was unlikely to be from Cascade.[37]

On the degree and significance of the fracturing in CU1, I find Atwood's analysis slightly more compelling. The existence of fractures in CU1 as it approaches the truncation, combined with the unchanged downward gradient over the eastern portion of the Boeing property, convinces me that flow through CU1 over the eastern portion of the Boeing property constitutes a source of contamination to the TSA. However, I also find compelling Landau's position regarding the use of all four subunits to calculate travel time. Although Subunits A, C, and D are less effective than B, their geologic structure convinces me that they restrict travel flow to a degree consistent with Landau's analysis. Accordingly, I would increase Boeing's relative percentage over Landau's initial allocation, while acknowledging lengthier travel time for the materials relative to future costs.

b. *Easterly flow over the truncation*

The experts also disagree over whether contaminants from the Boeing property have migrated into the TSA through an easterly flow of groundwater over the truncation. According to Landau, groundwater in the TGA at the Boeing property naturally flows away from the truncation, and this phenomenon became even more dramatic when Boeing began its pump and treat mitigation efforts in 1989, as the pumping action caused natural groundwater curves to further arc away from the truncation. Landau bases his conclusion upon monitoring well data and the absence of Boeing contaminants in chemical groundwater analyses east of the truncation.

Atwood agrees that the 1989 pump and treat ICA has lessened easterly flow at the Boeing property through its impact on groundwater flow contours; she does not believe that the pump and treat project has entirely eliminated such flow. She further believes that prior to the operation of the pump and treat system, significant easterly flow over the truncation occurred at the Boeing property. Atwood argues that the presence of TCA in chemical analyses of water near the truncation also supports her view that Boeing groundwater contributed to the TSA, noting that TCA has never been detected in Taggart and Shepard Springs.[38] In addition, Atwood believes that excavation during Boeing's construction of building 85–120 evidences groundwater flow over the truncation through springs and preferred pathways. Landau argues that springs witnessed during the building construction were only minor seepage, and do not indicate preferred pathways of easterly flow of water in the TGA at the Boeing property.

I find that the groundwater flow paths drawn by both experts indicate that there is some easterly flow at the Boeing property over the truncation. Further, because the pump and treat ICA at the Boeing property has affected groundwater flow paths in the TGA, I find it likely that easterly flow from the Boeing property was more significant in the past. Because I find that there is some flow through CU1 over the eastern portion of the Boeing property, and easterly flow in the TGA over the truncation into the TSA, I find it appropriate to hold Boeing responsible for a portion of the contamination in the mixed zone of the TSA plume.

Because I find that fractures in CU1 over the eastern portion of the Boeing property, and easterly flow over the truncation contributed to Boeing's contamination of the TSA, revision of Landau's mass analysis allocation is appropriate. Given the nature of the fractures, the types of chemicals involved, and my understanding of the overall geology and hydrogeology of the area, I find that Boeing's contribution to the TSA plume is best approximated at 30%. Accordingly, Boeing's

37. I note, however, that Dr. Landau also indicated that the low concentrations of TCA in the area east of the truncation could be from parties other than Boeing or Cascade.

38. Both Boeing and Cascade use TCA in their manufacturing processes. Further, Landau notes that prior agricultural and domestic use of TCA in the area could have contributed to TCA detected in perched wells east of the truncation.

share of responsibility for past costs is 30%, and that of Cascade, 70%.

### D. *The ICC Settlement*

■ Through a settlement with previous owners and operators of the site (the ICC settlement), Boeing will recover approximately $13.5 million toward the remediation of contamination at the Boeing property. Boeing has received approximately $7.5 million thus far under the terms of the settlement. Although Boeing argues that this amount should not be considered in determining Cascade's liability, I find that the prohibition of 42 U.S.C. § 9614 against double recovery requires that the settlement funds be factored into allocation of response costs.

Boeing's evidence at trial indicates that Boeing has incurred $18,433,001 in response costs, approximately one-third of which are TSA costs. Accordingly, I find that one-third of funds received by Boeing from the ICC settlement must be included in allocating TSA costs.

### E. *Calculation*

The relative contributions of each party are as follows: Boeing's TSA costs of $6,216,459 are reduced by ⅓ of the $7,500,000 recovered from previous owners/operators (or $2,500,000) to yield Boeing's TSA expenditures: $3,716,459. Cascade's TSA expenditures [39] and Boeing's are added together, for total TSA expenditures of $7,920,074. This total TSA expenditure is then allocated on a 30/70 basis.

Boeing's relative share, 30% of the total TSA expenditures of $7,920,074, is $2,376,022. As Boeing has already expended $3,716,459, Boeing has overpaid $1,340,437. Cascade's relative share, 70%, of the total TSA expenditures, is $5,544,052; as Cascade has expended $4,203,615, Cascade has underpaid $1,340,437. Accordingly, Cascade must pay Boeing $1,340,437, plus prejudgment interest [40] of $224,955, for a total payment of $1,565,392.

### F. *Future Costs*

■ Plaintiff is entitled to a declaratory judgment allocating responsibility for future costs if it establishes that hazardous substances were disposed of at the site, that plaintiff has incurred clean-up costs, and that there is a basis for allocating future liability. *See Wickland Oil Terminals,* 792 F.2d at 893 (declaratory judgment in CERCLA cases); *Cadillac Fairview,* 840 F.2d at 696 (prerequisites for declaratory judgments in CERCLA case). Cascade contends that because Section 113(f), the contribution section of CERCLA, fails to expressly provide for declaratory relief for future costs, Boeing is precluded from obtaining such a declaration. Cascade further argues that because the remedy for the TSA has not yet been determined, the dispute is not sufficiently definite to allow the entry of a declaratory judgment. Cascade also notes that a recent amendment to Oregon law may affect the remediation of the TSA.

Cascade's first argument is rejected under *Wickland.* Cascade does not dispute that hazardous substances from the Cascade property have contaminated the TSA under the Boeing property. Cascade also does not dispute that Boeing has incurred response costs to remedy the TSA. Accordingly, the requisite elements for a CERCLA plaintiff to obtain a declaratory judgment are met by the circumstances of this case. In addition, the experts for both parties testified that the likely remedy for the TSA contamination is a pump and treat system. While the costs and duration of such a system cannot be determined at present, the allocation of liability can be determined using the information presented by the parties at trial. Further, while amendments to Oregon law may affect the extent of the clean-up, they will not affect the mass of contaminants in the plume, or the other factors discussed above as appropriate means to allocate costs.

In addition, the resources required to relitigate a matter of this depth and complexity each time new response costs are incurred

---

**39.** Cascade submitted evidence at trial that its TSA expenditures were $4,203,615.

**40.** Prejudgment interest was calculated using the ratio established by Witcosky's determination of prejudgment interest: $6,216,459 to $7,259,712.

would be immense. The parties agree that the two sides of the plume are completely divisible, and evidence presented at trial indicates that the relative responsibility for the contaminants in the plume can be determined through groundwater flow data, chemical analysis, and hydrogeologic study. The entry of a declaratory judgment will prevent the parties from engaging in costly, time-consuming, and unnecessary re-litigation of liability each time a new response cost is incurred. Finally, the parties have effectively controlled the primary pathways for the migration of contamination to move from the TGA to the TSA. Thus, while contaminants will continue to migrate within the TSA, and remediation will be ongoing, the situation giving rise to the harm is stable enough to support the issuance of a declaratory judgment.

For the reasons discussed in allocating past costs, and subject to the qualifications below, I find that the use of mass as a starting point, tempered by the probability that Boeing is responsible for some of the contamination in the mixed portion of the plume, leads to an allocation of future costs which is the same as that for past costs. Accordingly, Cascade is responsible for 70% of future necessary costs incurred consistent with the NCP, and Boeing is responsible for 30%. I emphasize that this percentage is with respect to *all* costs incurred in investigating and remediating the TSA, not merely those costs incurred by Boeing. Both parties may seek contribution from each other for costs incurred to remediate and investigate the TSA; both parties must also be prepared to prove that such costs are necessary and incurred in substantial compliance with the NCP. Finally, one-third of future payments Boeing receives under the terms of the ICC settlement are to be considered as payments of TSA costs and therefore must be allocated 30% to Boeing, 70% to Cascade.

The parties are also instructed to establish accounting systems which completely segregate costs incurred to remediate the TSA from other investigatory and remediation costs at each of their properties. The parties must be prepared to show, as they did in this matter, that the costs they incur are necessary and consistent with the NCP.

In allowing declaratory relief, I have considered the possibility of future inequities resulting from the circumstances surrounding this remediation. It has been exceedingly difficult to settle upon a fixed allocation scheme; imposing that allocation on the parties into the indefinite future is also troubling. However, the allocation scheme established here is supported by the evidence presented at trial, and accurately reflects both the current situation and the situation as it is likely to exist and change during remediation.

The issues decided and the facts and conclusions to this point are binding on the parties, and will not be revisited. This does not, however, mean that new developments will be completely ignored. The success or failure of remedial efforts, scientific advances, discovery of other sources contributing to the plume, and additional pathways for migration to move from the TGA at either site into the TSA may impact remediation at the site and may appropriately reopen the question of equitable cost allocation. If future developments in these or other areas enable either party to show that the allocation scheme is no longer equitable and appropriate, I will consider this information. However, known variables of uncertain quantification will not be re-examined. Thus, I will not revisit my conclusions regarding mass in the plume, existing sources to the plume, significance of easterly flow over the truncation, or the significance of fractures in CU1. Only new information, unknown to the parties at the time of trial or not reasonably within their contemplation, may constitute grounds for future consideration. By this qualification of my opinion, I do not wish to encourage either party to return to court lightly. I would require a clear showing of an actual and significant change before considering any alteration in the allocation scheme.

## V. *CONCLUSION*

Cascade is liable for 70% of past costs incurred by the parties in investigating and remediating the TSA. Boeing is liable for 30% of such costs. Boeing is entitled to a

reimbursement of $1,565,392 from Cascade. Further, Boeing and Cascade are responsible, on a 30/70 percent allocation, for future response costs incurred to remediate the TSA which are necessary and incurred in compliance with the NCP. Finally, ⅓ of those funds received in the future by Boeing pursuant to its settlement agreement with prior owners/operators at the site must be allocated according to this scheme: 30% to Boeing, 70% to Cascade.

I make these determinations mindful that they will profoundly affect the rights and responsibilities of both Boeing and Cascade for many years to come. Future events and discoveries may impact or disprove the division of responsibility established by this opinion; in such an event, the parties may return to this court for resolution.

IT IS SO ORDERED.

**LOCATION MAP**

Figure 1

1144

| Geologic Description | Geologic Unit | Geologic Column | Hydrogeologic Unit |
|---|---|---|---|

**Geologic and Hydrogeologic Column**

Brown floodplain Sand and Silt

Gray GRAVEL with cobbles

Troutdale Gravel

Blue Lake Aquifer (BLA)

Troutdale Gravel Aquifer (TGA)

Subunit A: Tan SANDSTONE and SILTSTONE

Siltstone Unit 1 (SU1)

Subunit B: Blue-gray, clayey SILTSTONE

Confining Unit 1 (CU1)

Subunit C: Black SANDSTONE

Subunit D: Brown SILTSTONE

Dark gray SANDSTONE with conglomerate lenses

Troutdale Sandstone

Sandstone Subunit

Troutdale Sandstone Aquifer (TSA)

Gray CONGLOMERATE with sandstone

Troutdale Conglomerate

Conglomerate Subunit

Blue-gray SILTSTONE

Dark gray SANDSTONE and SILTSTONE

Siltstone Unit 2 (SU2)

Confining Unit 2 (CU2)

Green-gray SILTSTONE

Dark gray SANDSTONE

Sand and Gravel Aquifer (SGA)

Gray CONGLOMERATE with sandstone

Conglomerate and Sandstone

Figure 2

—Figure 3

WEST

EAST

TGA/QAL

CU1

TSA

MIGRATION OVER THE CU1 TRUNCATION

G:\07A81\00\10I-A 11-03-93 CJS PLOT 1-I

Figure 4

Figure 5. Generalized Hydrogeologic Cross Section (Not to Scale)

Figure 5a

VOCₓ CONTAMINATION IN THE TSA SANDSTONE
(AUGUST 1994)

Figure 6

1150

Figure 7

PLUME DIVISION IN TSA SANDSTONE

VOCₓ CONTAMINATION IN THE TSA CONGLOMERATE
(AUGUST 1994)

Figure 8

1152

Figure 9

PLUME DIVISION IN TSA CONGLOMERATE