**ENVIRONMENTAL TRANSPORTATION SYSTEMS, INC., an Oklahoma corporation, and Canal Insurance Company, a South Carolina corporation, Plaintiffs,**

**v.**

**ENSCO, INC., an Arkansas corporation, both individually and as successor in interest to Energy Systems Company, an Arkansas corporation, Northern States Power Company, and Evanston Insurance Company, an Illinois corporation, Defendants.**

No. 89–4001.

United States District Court,
C.D. Illinois.

April 24, 1991.

Robert J. Noe, Moline, Ill., Linda G. Alexander, Oklahoma City, Okl., for plaintiffs.

Sheldon A. Zabel, Chicago, Ill., Willis Conkhite, III, Little Rock, Ark., Fritz Huszagh, Chicago, Ill., for defendants.

## ORDER

MIHM, District Judge.

Before the Court are Cross–Motions for Summary Judgment. For the reasons set forth below, each of these Motions is granted in part and denied in part.

## BACKGROUND

In 1984 the Defendant Northern States Power ("NSP") decided to dispose of certain hazardous or toxic chemicals being stored at its plant near Minneapolis, Minnesota. The hazardous chemicals were polychlorinated biphenyls ("PCBs") and were stored in large drums called "transformers." NSP contracted with Defendant ENSCO, Inc. ("ENSCO") for the removal and disposal of the transformers and the PCBs they contained. ENSCO was to transport the PCB transformers from Minneapolis to a facility in Tennessee, where they would be drained and flushed. The PCBs would then be incinerated and the empty transformers would be disposed of in a landfill.

ENSCO subcontracted the transportation portion of the disposal contract to the Plaintiff Environmental Transportation Systems, Inc. ("ETS"). Under this agreement, ETS was to haul the full transformers by truck from Minneapolis to the ENSCO disposal site in Tennessee, where ENSCO would then dispose of the materials. On November 9, 1984, an ETS flatbed truck was hauling three PCB transformers on this route, but never made it to Tennessee. While driving on the interchange ramp which connects I–74 with I–80 near Moline, Illinois, the ETS truck drove off the ramp and tipped over. When the truck tipped over, one or more of the transformers ruptured, resulting in a spill of the PCBs. No other vehicles were involved in the accident.

The driver of the truck notified ETS, which in turn, through its president, notified ENSCO. ETS requested that ENSCO perform a clean up operation for the spill and further agreed to reimburse ENSCO for all expenses it incurred in conducting the clean up. After the clean up was completed and ENSCO was paid for the job, ETS submitted a claim for the clean up costs to its insurer, the Plaintiff Canal Insurance Company ("Canal"). Canal refused to cover the costs and litigation ensued. A settlement was eventually reached whereby ETS and Canal each covered one-half of the clean up costs. ETS and Canal then joined forces and brought this contribution action against ENSCO and NSP.

This action was brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., which provides for contribution actions between private parties involved in chemical spills. ETS and ENSCO filed Cross–Motions for Summary Judgment. ETS's summary judgment motion sought a determination that ENSCO and NSP were strictly liable for contribution under CERCLA. ENSCO's Motion for Summary Judgment sought a finding that ETS was entirely

responsible for the accident and resulting spill and therefore not entitled to contribution from any other parties. This Court held two hearings on these motions at which counsel for each side made oral arguments in further support of their respective Motions for Summary Judgment. The following discussion represents this Court's disposition of all issues raised.

## DISCUSSION

### I. ETS'S MOTION FOR SUMMARY JUDGMENT

■ ETS's Motion for Summary Judgment argues that CERCLA makes ENSCO and NSP strictly liable for contribution and that all three responsible parties should be held responsible for the clean up costs on a pro rata basis. ENSCO responds that it should not be held liable for any contribution under CERCLA, first because ETS waived its right to contributions by agreeing to shoulder the clean up costs, and second, because ETS did not file its contribution action within the applicable statute of limitations period. ENSCO does not respond to ETS's argument that the prerequisites for contribution liability have been met under CERCLA. Instead, it refers to an argument made earlier in support of its Motion to Dismiss as stating and preserving its views on this subject. For the reasons that follow, this Court finds that ENSCO is liable for contribution. The percentage of clean up costs it is liable for, however, is another issued saved for section II below.

CERCLA automatically provides for contribution liability if a four-part test is met: (1) the site in question is a "facility" as defined by CERCLA; (2) the Defendant is a "responsible person" for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs. 42 U.S.C. § 9607(a). *See also United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1378–79 (8th Cir.1989). This four-part test has been satisfied here.

We are dealing here with a facility as defined by CERCLA. The transformers which held the PCBs, the ETS truck which hauled the transformers, and the area of land which suffered the spill all clearly fall within the definition of "facility" as defined in CERCLA. Section 9601(9)(A) of CERCLA defines "facility" to include "storage containers," "motor vehicle," and "areas" where hazardous substances are located. Secondly, the Defendants ENSCO and NSP are "responsible persons" as defined by CERCLA. Section 9607(a)(3) defines "responsible persons" as including those who contract for disposal or contract for transport for disposal of hazardous substances. ENSCO and NSP undoubtedly fit this category. The third requirement, that there was a spill or release of hazardous substances, has undeniably been satisfied. The final requirement that the release caused the Plaintiff to incur response costs has been satisfied because both ETS and its insurer have incurred such response costs. Accordingly, the four elements which set forth a prima facie case for contribution liability under CERCLA have all been met and therefore ENSCO is seemingly liable.

■ While it does not dispute that ETS has set forth a prima facie case for contribution liability under CERCLA, ENSCO argues that ETS's action is barred since it was not timely filed. ENSCO points to the CERCLA statute of limitations provision found in § 9613(g) which requires that a contribution action must be brought within three years of the completion of the clean up. The parties agree that the clean up here was finished on May 14, 1985. Since ETS did not file until January 4, 1989, about three and one-half years later, ENSCO argues that ETS's claim must fail. However, this argument is without merit because the statute of limitations provision was added to CERCLA *after* the accident and clean up in this case occurred.

■ The original version of CERCLA contained no statute of limitations provision. *See United States v. Moore,* 698 F.Supp. 622, 625 (E.D.Va.1988). The statute of limitations provision referred to above was added in the course of the 1986 Superfund Amendments and Reauthoriza-

tion Act ("SARA"), Pub.L. No. 99–499, which became effective law on October 17, 1986. Where a statutory amendment imposes a limitations provision on a cause of action where none had previously existed, the period will begin to run for pre-existing claims on the effective date of the amendment. *Superior Engraving Co. v. National Labor Relations Board*, 183 F.2d 783, 789 (7th Cir.1950). *See also T & E Industries, Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 704 (D.N.J.1988). Thus, ETS had until October 17, 1989 to file its claim, and therefore, its January 4, 1989 filing was a timely commencement of this action.

■ ENSCO argues in the alternative that ETS waived its right to seek contribution under CERCLA because it agreed to fully reimburse ENSCO for the clean up costs. Having so promised, ENSCO argues, ETS is now estopped from asserting a right of contribution. This argument also is without merit.

ETS's promise to ENSCO to reimburse it for the clean up costs does not appear to be binding—ENSCO has failed to point to anything given to ETS as consideration for this promise. However, this issue need not be addressed substantively because waiver is not a valid defense to a CERCLA contribution action. Section 9607(a) clearly states that the only defenses available in a CERCLA recovery action are those enumerated in § 9607(b). ENSCO does not argue that any of these defenses apply to this case, nor does it appear that it could so argue.

Thus, as an initial matter, ENSCO is, under the terms of CERCLA, liable to ETS for contribution ETS's Motion for Summary Judgment on this issue is therefore granted. However, the issue of *how much* ENSCO is liable for is another matter. It is this issue which is addressed in ENSCO's Motion for Summary Judgment.

## II. ENSCO'S MOTION FOR SUMMARY JUDGMENT

■ ENSCO's Motion for Summary Judgment argues that the facts of record establish that ETS was 100% at fault for the accident and resulting spill and therefore should be held responsible for the full cost of the clean up. In support of this argument, ENSCO cites to § 9613(f)(1) of CERCLA which instructs that the court in contribution action should apportion clean up costs equitably. In response, ETS argues that there is evidence that ENSCO and/or NSP were at least partially responsible for the PCB spill, and that since there is no way to fairly allocate response costs, the expense should be divided equally between the three parties.

■ Section 9613(f)(1) of CERCLA states that, "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Thus, it is apparent that a finding that a defendant is a "responsible party" under § 9607(a), as this Court decided ENSCO was in section I above, is only the initial inquiry. Finding that a defendant is a responsible party and thus strictly liable for contribution under § 9607(a) does not mean that all parties are equally responsible and should share costs on a pro rata basis. Rather, such a finding means only that a defendant is *potentially* liable for contribution under CERCLA depending upon the relative fault of the parties. Once a defendant is found to be a responsible party under § 9607(a), the question shifts to *how much* is that defendant responsible for under the provisions in § 9613(f)(1). Thus, ETS's request for an automatic pro rata assessment is rejected as patently inconsistent with the dictates of CERCLA.

■ Section 9613 contemplates a court's assessing the "relative culpability of each responsible party in determining the proportionate share of costs each must bear." *United States v. Monsanto Co.*, 858 F.2d 160, 170 n. 29 (4th Cir.1988). *See also Versatile Metals v. Union Corp.*, 693 F.Supp. 1563, 1572 (E.D.Pa.1988) ("relative fault will be considered in this court's apportionment of necessary response costs"). ENSCO's Cross–Motion for Summary Judgment argues that the facts demonstrate that ETS and its driver were 100% at fault for the accident and resulting spill

and therefore, under § 9613(f), it should bear 100% of the response costs. The following summarizes the evidence in the record pointed to by ENSCO and NSP supporting the proposition that ETS was entirely at fault for the accident and spill.

1. The accident report prepared at the accident scene by Illinois State Trooper Robert Wills indicates that the suggested speed limit on the ramp where the accident occurred is 30 miles per hour.

2. The ETS truck driver, Ronald Fresh, told Trooper Wills that he came onto the ramp "too fast."

3. Trooper Wills issued to Fresh a citation for driving too fast for conditions.

4. Fresh later pleaded guilty to the charges of driving too fast for conditions.

5. Fresh also told Harry Bray, an NSP manager, that he was driving too fast on the ramp to keep the rig in control.

6. ETS admitted, through its former president Charles Crafton, that the driver Ronald Fresh was at fault for the accident.

7. ETS admitted, through its vice-president David Kennedy, that the "sole cause" of the accident was that the driver was driving too fast and that ETS is therefore the only party responsible for the accident and spill.

ETS responds to this evidence with two arguments. First, it argues that Ronald Fresh also made a statement that it was the improper loading and weight distribution of the PCB transformers which really caused the truck to overturn. Secondly, ETS argues that even if it was responsible for the accident, the *spill* itself was at least partially caused by ENSCO's failure to comply with federal regulations regarding transportation of hazardous materials.

In support of its argument that there is evidence in the record supporting the theory that ETS and its driver were not solely responsible for the accident, ETS points to a telephone interview with the driver, Ronald Fresh, taken on November 9, 1984. In that interview, Fresh stated:

Q: All right, and from that point tell me what happened?

A: Okay, it was after dark, at, at that time of the year, it was it was extremely dark, I, I got on the interchange or the entrance ramp and it was not lighted. The curves that were there were also not marked, also it had an extremely low shoulder of about 6 inches which was not posted. I went into an "S" curve, not knowing that the "S" curve was there, I negotiated the first curve, let my unit drift to the high side of the curve in anticipation of the road going ahead and leveling out and going on to the interchange I was trying to get to.

Q: Uh-huh.

A: When I did, I let it drift high, when I drifted it high, I was on the high side of the second curve, couldn't negotiate it. I attempted to run along the shoulder, as soon as the truck dropped off the shoulder, it was veered to the right, at that point I I, I had of course I had applied my brakes, I tried to apply the trailer brakes only at the time in order to try to keep the load from shifting with the top heavy load, these transformers, we're talking about 13 feet in the air from the ground, not from my trailer but from the ground.

Q: Uh-huh.

A: To keep them from shifting and forcing me to roll over, I tried, I attempted to drive out into the field. I had not, did not realize that the, it had rained that heavily up there and it was that muddy. As soon as my tractor broke off of the concrete and went into the mud, well it just buried up forcing the load to just roll me over on the passenger side of tractor and trailer.

When considered in the context of ENSCO's evidence, these statements do not create a genuine issue of fact over what caused the accident. The same Ronald

Fresh also told the Illinois State Trooper minutes after the accident that the truck tipped over because he was going too fast on the ramp to handle the curve. Most importantly, the text of the statements above do not indicate, as ETS suggests, that the way the PCB transformers were loaded actually caused the truck to tip over. Rather, those statements say only that, *once Fresh had driven off the pavement due to his excessive speed,* the momentum of the heavy trailer rig tipped his truck over. Thus, it is clear that the evidence of record could only support a finding that ETS and its driver were solely at fault for the accident itself.

■ ETS's second argument is that, even if it was entirely at fault for the accident, it was not entirely responsible for the PCB spill. ETS argues that the cause of the spill is at least partially attributable to the improper packaging of PCBs and the improper loading of the transformers onto the truck. ETS does not refer to any expert testimony or lay opinion to support this position. Instead, it cites to Department of Transportation ("DOT") regulations, found at 49 C.F.R. Part 173.12, which set forth requirements for the transportation of hazardous materials. ENSCO replies to this argument in two ways: First, ENSCO asserts that ETS was responsible for providing the shipping equipment and for loading the transformers onto the truck and therefore that any violation of federal regulations is attributable only to ETS; secondly, ENSCO asserts that, assuming ENSCO was responsible for loading the transformers and supplying the shipping equipment, such activities were governed by certain Environmental Protection Agency ("EPA") regulations, found at 40 C.F.R. Part 761.20, with which it fully complied. Because this Court agrees with ENSCO that the EPA regulations, and not the DOT regulations, govern the transportation of PCBs here, and because this Court agrees that those EPA regulations were complied with, ETS's argument that ENSCO is partially at fault for the spill due to non-compliance with federal regulations is rejected.

The Transportation Safety Act of 1974, codified at 49 U.S.C. App. § 1801 *et seq.* authorized the DOT in § 1804 to promulgate regulations prescribing methods for the safe transportation of hazardous materials, presumably including PCBs. Pursuant to this congressional directive, the DOT promulgated regulations which ETS claims that ENSCO violated. However, the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.* passed in 1986, which generally dealt with the production and disposal of toxic substances, contains a section which singles out PCBs and directs the Environmental Protection Agency ("EPA") to promulgate rules regarding the disposal and "distribution in commerce" of PCBs. *See* 15 U.S.C. § 2605(e)(1). Pursuant to this enabling statute, the EPA promulgated regulations.

Because of the existence of both the DOT regulations and the EPA regulations on what happens to be the same subject, it is not immediately clear what Congress intended regarding the regulation of transportation of PCBs for the purposes of disposal. Did Congress intend that the DOT regulations regarding transportation of hazardous materials should apply to the fact situation in this case? Did it intend that the EPA regulations regarding disposal and distribution in commerce of PCBs should apply to the fact situation here? Or did Congress intend for both to apply simultaneously? Given that the DOT and the EPA regulations command different conduct, it would seem that it was not anticipated that the two would function together. This suspicion is bolstered by the fact that neither statute makes reference to the other. The only cross-reference cited by the parties appears in the DOT regulations at 49 C.F.R. § 173.510(a)(1), which states that the EPA regulations control packaging of PCBs.

Clearly, to the extent that the regulations complement each other, or at least, do not conflict, both apply. But here there is a conflict—the DOT regulations found at 49 C.F.R. § 173.12 versus the EPA regulations found at 40 C.F.R. § 761.20. The issue then becomes, faced with this conflict, which regulation applies. On the one hand, the DOT regulations were authorized

by Congress to control the transportation of all hazardous substances, presumably including PCBs. 49 U.S.C. App. § 1804. On the other hand, the EPA regulations were authorized by Congress to govern all aspects of PCB distribution and disposal, presumably including transportation in the course of disposal. 15 U.S.C. § 2605(e)(1). ETS argues that the conflict should be resolved in favor of the DOT regulations, since those regulations specifically deal with the activity of transportation of hazardous materials, which is what is involved here. ENSCO argues that the EPA regulations are more on point, since they specifically deal with all aspects of PCBs, the hazardous material at issue here. While the answer to this question is not entirely clear to the Court, it is this Court's finding that the regulations promulgated by the EPA pursuant to TSCA more closely relate to the transportation of PCBs by ETS and therefore those regulations preempt the application of the DOT regulations.

The fact that the TSCA was enacted after the Transportation Safety Act lends some support to the idea that the TSCA's rules regarding PCBs supersede those found in the TSCA. When two statutes are seemingly in conflict, a common rule of statutory construction is to give effect to that statute which came later in time.

Moreover, there is substantive support for the notion that, when it came to PCBs, the Congress which drafted the TSCA in 1976 intended that a completely separate and specific set of rules would apply. The legislative history of TSCA indicates that Congress was seriously concerned about the threat posed by PCBs and wished to single them out for separate attention. As the Circuit Court of Appeals for the District of Columbia noted when considering § 2605 of the TSCA:

> Considering that there are few statutes aimed so particularly at control of an individual chemical, we construe this provision as a significant comment on the failure of existing regulatory mechanisms.

*Environmental Defense Fund v. EPA,* 598 F.2d 62, 67 (D.C.Cir.1978). In a footnote in that same opinion, the Circuit Court for the District of Columbia referred to the statement of the senator who drafted the PCB section of TSCA.

> Senator Nelson, who introduced the amendment that created § 6(e), 15 U.S.C. § 2605(e) (1976), stated that "[i]t is preferable not to enact legislation on a substance-by-substance basis but rather generically, as the Toxic Substances bill proposes to do. However, the PCB problem shows no sign of abating and it has become so severe that it is necessary to address the problem head-on, as we were forced to do with DDT." (Citations omitted).

*Id.* The Circuit Court for the District of Columbia later noted that the House of Representatives expressed similar concerns when supporting the passage of that section of the TSCA. *Env. Def. Fund v. Env. Prot. Agency,* 636 F.2d 1267, 1271 (D.C.Cir. 1980). *See also Potomac Elec. Power Co. v. Sachs,* 639 F.Supp. 856, 857 (D.Md.1986).

It is important to note that the language of the TSCA itself indicates that Congress intended for it to apply to the *transportation* of PCBs, thereby by implication preempting the control of the Transportation Safety Act in regard to PCBs. TSCA, at 2605(e)(1), orders the EPA to promulgate rules regarding the "disposal" and "distribution in commerce" of PCBs. The term "disposal" would seem to include transportation incidental to the actual disposal of PCBs. But even if transportation for disposal were not covered by the term "disposal," that activity comes within the purview of § 2605(e)(1) by virtue of the term "distribution in commerce." In the definition section of TSCA at § 2602(4), "distribution in commerce" is defined in terms of "commerce," which is in turn defined in § 2602(3) as "trade, traffic, *transportation,* or other commerce." Thus, the term "distribution in commerce" includes transportation. Since the regulations promulgated by the EPA deal with the transportation of PCBs, while the DOT regulations deal with the transportation of hazardous substances generically, it is clear that the EPA regulations must supersede the DOT

regulations in the circumstances of this case.

 Having concluded that the EPA regulations apply, it should briefly be mentioned that those regulations were appropriately complied with by ENSCO. The EPA regulations provide at 40 C.F.R. 761.-20(c)(2) that PCBs may be distributed in commerce (therefore transported) provided that it is done so in a "totally enclosed" manner. The same regulation sets forth in its introductory section that PCBs which are contained in "intact, non-leaking electrical equipment such as transformers" are "totally enclosed." Thus, under the TSCA and the EPA regulations promulgated thereunder, PCBs may be transported if done so in a totally enclosed manner such as in an intact, non-leaking transformer. ETS has not asserted, nor does it appear under the current state of the record that it could assert, that the NSP transformers picked up by ETS at the NSP plant were violative of these federal provisions. Accordingly, ETS's second argument that ENSCO's violation of applicable federal regulations regarding transportation of hazardous materials is evidence of ENSCO's partial fault for the PCB spill is without merit. Because ETS has failed to come forth with evidence to rebut ENSCO's evidence that the spill was entirely the fault of ETS, ENSCO's Motion for Summary Judgment is hereby granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Mechnig v. Sears, Roebuck and Company*, 864 F.2d 1359, 1363 (7th Cir.1988). This Court notes, however, that it is somewhat ironic that an application of the EPA regulations which were intended to improve existing safeguards on PCB production and distribution may result in less stringent restrictions on PCB transportation. Whether this concern is a reality depends of course upon the relative safeguards afforded by the EPA requirement of "totally enclosed" versus the general DOT restrictions upon transportation.

## CONCLUSION

Because ENSCO is a responsible party as defined by CERCLA, it was potentially liable for contribution under that statute and therefore the Plaintiffs are entitled to summary judgment on the issue of potential liability. However, when the relative fault of the parties is analyzed, it is clear that ETS was fully responsible. ENSCO, Inc.'s and Northern States Power Company's Motion for Summary Judgment on the issue of contribution is therefore GRANTED against Environmental Transportation Systems, Inc. and Canal Insurance Company.