FARMLAND INDUSTRIES,
INC., Plaintiff,

v.

COLORADO & EASTERN RAILROAD
COMPANY, Great Northern Transporta-
tion Company, and Gary W. Flanders,
Defendants.

Civil Action No. 89–B–1786.

United States District Court,
D. Colorado.

Nov. 6, 1996.

Wayne B. Schroeder, Jody Harper Alderman, Grimshaw & Harring, Denver, CO, for Plaintiff.

Timothy R. Gablehouse, Joshua B. Epel, Karina M. Thomas, Gablehouse & Epel, Denver, CO, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, & ORDER

BABCOCK, District Judge.

A one-day trial to the court was held on October 28, 1996. Having heard testimony and reviewed the exhibits and the memoranda of law submitted by the parties, I make the following findings of facts and conclusions of law and order the entry of judgment.

## FINDINGS OF FACT

### A.

A pesticide formulation plant, originally owned by Woodbury Chemical Company, was operated in Commerce City, Colorado, from the late 1950s until mid–1971. In 1965, a fire destroyed the main building of the Woodbury Chemical Company. Pesticide-ridden rubble from the fire contaminated the property. In 1966, a new building was constructed at the same location. A former subsidiary of Farmland Industries, Inc. (Farmland), Missouri Chemical Company, acquired the plant and the property in 1968. In August 1971, Missouri Chemical Company sold the property to McKesson Corporation (McKesson). Herein, the building constructed on the property will be called the "McKesson Building."

In September 1983, the United States Environmental Protection Agency (EPA) determined that ongoing releases of hazardous substances were occurring and placed a 2.2 acre parcel adjacent to and east of the McKesson Building on the National Priorities List as the Woodbury Chemical Superfund Site (the "Woodbury Site" or "Site"). That parcel is about 600 feet east to west by 175 feet north to south. The EPA designated it Operable Unit 1. At that time, the 2.2 acre parcel was owned by Chicago, Rock Island and Pacific Railroad Company (CRIP).

On December 19, 1984, Colorado Eastern Railroad Company (CERC) purchased the CRIP 2.2 acres and another CRIP parcel of land adjacent to the listed Site on the west side (about 1,000 feet east to west; approximately 8–10 acres) (the CERC Parcels), and a shortline railroad track that runs along the northern edge of the Site (the CERC Railroad Tracks). A railroad spur ran from the CERC Railroad Tracks to provide rail service to the McKesson Building. From December 19, 1984, until August 1, 1989, CERC operated the CERC Railroad Tracks.

On August 26, 1985, the EPA notified Gary W. Flanders (Flanders) of CERC's potential liability for releases and threatened releases from the Woodbury Site. On September 22, 1986, the Site was expanded to include the westerly CERC Parcel and the McKesson Property. The EPA designated those parcels Operable Unit 2.

In October 1989, the United States filed suit against all known "PRPs," including Farmland, McKesson and CERC. Farmland cross-claimed against CERC, Great Northern Transportation Company (GNTC), and Gary W. Flanders (collectively, the CERC Parties).

On September 4, 1990, the United States, Farmland and McKesson entered into a Partial Consent Decree, pursuant to which Farmland and McKesson Corporation were required to undertake remedial activities at the Woodbury Site and to reimburse the government $700,000 for response costs. By June 1992, Farmland and McKesson had completed all remediation at a cost in excess of $15 million, including $1,439,330.00 to remove certain soil and debris from the CERC Parcels. Farmland paid 51% of those costs.

A consent decree between the United States and CERC was entered by the Court on April 20, 1992. CERC agreed to pay $100,000.00 to the EPA. This payment has not yet been made.

Judge Carrigan granted Farmland's Motion for Partial Summary Judgment on the issue of the amount and reasonableness of the "additional" cleanup costs of $734,058.30 (.51 × $1,439,330.00) incurred by Farmland. *United States v. Colorado & Eastern R.R.*, 832 F.Supp. 304, 306 (D.Colo.1993). In June 1993, after a two day trial, Judge Carrigan held that Farmland, as a matter of law, could recover its response costs against the CERC Parties, jointly and severally, under § 107(a), and entered judgment for Farmland and against the CERC Parties for $734,058.30 (which was later amended to include prejudgment interest of $27,060.00).

The CERC Parties appealed. Upon rehearing, the Tenth Circuit held, *inter alia,* that: (1) PRPs must proceed under § 113(f) (contribution), rather than § 107(a) (strict liability), against other PRPs for the recovery of response costs; and (2) the "matter addressed" in the CERC–EPA consent decree is the government's past response costs, and such consent decree does not bar Farmland's contribution claim against CERC. *United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530, 1539 (10th Cir.1995). The Tenth Circuit remanded the case to this court "to consider Farmland's contribution claim under § 113(f) and to apply any equitable factors it determines appropriate." *Id.* at 1539.

I granted in part, and denied in part, Farmland's Motion for Partial Summary Judgment, holding that the CERC Parties are liable parties under CERCLA § 113(f), and, holding that the CERC Parties "were a cause of Farmland's incurrence of increased response costs, the degree of which shall be determined at trial." *Farmland Industries, Inc. v. Colorado & Eastern R.R. Co.*, 922 F.Supp. 437, 442 (D.Colo.1996). Thus, the only issue remaining for trial is the allocation of the additional response costs. *See CERC,* 50 F.3d at 1539.

### B.

Flanders was the sole shareholder of CERC from March 8, 1983, until May 29, 1987. On May 29, 1987, Mr. Flanders exchanged his shares of CERC for common stock of GNTC, thereby causing GNTC to become the 100% owner of CERC. Flanders was the sole shareholder of GNTC from July 2, 1986, until September 30, 1991. Evelyn J. Flanders, Flanders' wife, is the current sole shareholder of GNTC. Evelyn J. Flanders is an officer and director of both GNTC and CERC.

Flanders has been an officer, director and shareholder of both CERC and GNTC. Flanders held the position of officer and director of both companies simultaneously at relevant times in the past. Flanders resigned as an officer and director of CERC and GNTC effective December 30, 1991. Flanders, GNTC and CERC (collectively, the "CERC Parties") are owners and operators within the meaning of 42 U.S.C. § 9607. Findings of Fact, Conclusions of Law and Order for Judgment, p. 3, n. 3, June 9, 1993.

Initially, I find Flanders' testimony at trial incredible, especially in the area of his personal finances. Farmland presented evidence showing that Flanders and/or his wife received payments or loans from CERC in amounts ranging from $400,000 to $1,000,000. Pltf. Ex. 11–13, 21. The payments were made from 1986 to 1989, after Flanders had been notified by the EPA of CERC's status as a PRP. Somehow, Flanders, when cross-examined regarding these transactions, could not recall whether they had ever occurred, let alone the reasons for them. Farmland offered into evidence a report of an accountant detailing how Flanders stripped CERC of its assets after he was notified of CERC's PRP status. I am persuaded that Flanders did exactly that, despite Flanders' denial of such intent during his testimony. Given this backdrop, I turn to Farmland's substantive contentions.

Farmland alleges that it incurred additional cleanup costs due to two separate problems on the CERC property. First, a berm that was part of a drainage ditch for the Site was damaged and broke, causing contaminated soil to be washed down onto previously clean areas. Farmland first alleges that the CERC parties caused the breach and then made the damage worse by refusing to allow Farmland timely access to remediate. Second, Farmland contends that the CERC parties failed to act reasonably to prevent public dumping of trash onto the Site. Trash dumped on the Site by third parties became contaminated and had to be disposed of by Farmland. Farmland alleges that the CERC Parties neither erected a fence to stop the dumping as they were requested to do nor allowed Farmland timely access to erect the fence. I first address the berm issue.

A drainage ditch runs through the CERC properties, roughly from East to West. At the time of the washout in May 1989, a large berm supported the drainage ditch on the north side. The berm ran past the northern edge of the McKesson building and south of the CERC Railroad Tracks. In late-May 1989, the berm gave way and water was diverted out of the ditch. The water carried contamination from other parts of the property, and it washed contaminated sand and soil onto the CERC Railroad Tracks and other areas of the property.

Farmland presented circumstantial evidence in an attempt to show that the CERC Parties caused the berm to be cut, thereby causing the breach of the drainage ditch and further contamination of the property. Farmland presented photographs of the berm, showing the cut in the berm and a caterpillar tractor nearby. Pltf. Ex. 52A–G. Testimony established that the size of the cut was consistent with the size of the tractor. In addition, Suzanne Wohlgemuth testified that she observed machine-made tracks leading up to the cut. Also, approximately six to seven yards of dirt had been dumped into the drainage ditch.

Farmland could not, however, proffer any cogent reason why the CERC parties would have cut the berm. After the ditch was breached, the CERC Railroad Tracks were covered with sand and dirt each time it rained, and CERC had to clear the tracks after each washout. There is no credible reason why the CERC Parties would have wanted to block their own tracks. Therefore, I find that the CERC Parties offer a more plausible explanation for the cut in the berm.

Thomas Mars testified that he was working in his office adjacent and to the north of the CERC Railroad Tracks nearly every day during May 1989. One particular day that spring it was raining hard and he noticed that sand and dirt had totally covered the tracks because the berm had been washed out. He then watched as a train engineer attempted to clear the tracks with a railroad tie fastened to the front of the train. Instead, the train was derailed.

Fearing that the train engine would be severely damaged if filled with water and sand, Mars enlisted the aid of another nearby business to dig the train out. Using his own caterpillar tractor and some larger loaders from another area business, Mars and others cleared the tracks and dug the train out enough to get it back on the rails. Mars testified that neither he nor anyone else present cut the berm. Rather, he believes that it gave way from natural causes. The

tracks around the berm were created by their machines during the rescue effort.

I find Mars' testimony to be credible. Neither Farmland nor the CERC Parties can be held directly responsible for the initial breach of the drainage ditch. It was, as best I can ascertain, an act of God.

CERC's reactions to the initial washout, however, were acts all their own. CERC did not notify either Farmland or the EPA of the problem. Rather, Suzanne Wohlgemuth discovered the breach upon inspecting the property days later. CERC also did not attempt to fix the berm. Flanders testified that he was afraid of incurring liability for incorrectly fixing the berm and that the EPA advised him to do nothing. The evidence, however, fails to bear out Flanders' version of the events.

The initial breach of the drainage ditch occurred in May 1989. CERC apparently did nothing in response except clear the tracks after each heavy rain caused further washout. The breach to the ditch continued to worsen with each washout. Farmland began negotiating with CERC for access to the Site to perform remediation in July 1989. On August 24, 1989, CERC sent EPA a "proposal" to improve drainage conditions on the Site by moving the ditch to a different portion of the property. Pltf. Ex. 65. The proposal was the idea of Jay Turner, CERC property manager. Turner is not an engineer, and no engineer was consulted regarding the proposal.

On October 3, 1989, the EPA notified CERC that it could not comment on the proposal because it involved lands outside of the EPA's jurisdiction. Pltf. Ex. 31. The EPA did state that "[w]ith regard to the suggested repair work for the gap in the existing berm which is on the CERC property ... again, you may proceed with necessary repairs on your property." The EPA warned, however, that "the burden is on CERC to ensure that the work does not exacerbate the contamination at the site."

Flanders insisted that those warnings from the EPA kept him from repairing the berm. I find Flanders' contention incredible. The EPA's caveat was boilerplate. It is axiomatic that anyone working on a Superfund Site must be careful not to exacerbate the contamination. That does not mean, however, that the CERC Parties were precluded from obtaining the adequate expertise to remedy the situation.

In addition, the CERC parties failed to grant Farmland timely access to the site so that Farmland could prevent further contamination. Despite multiple requests, CERC continued to deny access for remediation. Flanders testified that CERC had certain concerns regarding access that were not being met. *See* Ex. 40A–D. I find Flanders' testimony again unbelievable. Even if Flanders' concerns were valid and not met, it need not have taken nearly two years to remedy the situation. The CERC Parties did not consent to access until the EPA threatened to obtain an administrative order for access on February 1, 1991, more than twenty months after the original washout.

■ The CERC parties acted unreasonably in response to the berm washout. They could have fixed the berm immediately, but did not. They could have granted Farmland and the EPA access to remediate immediately, but they did not. Instead, it took a letter threatening an administrative action to prompt the CERC Parties to allow access to the Site.

Kamyar N. Manesh, a Senior Environmental and Safety Specialist with Environmental Safety Services, Inc. (ESSI), the contractor in charge of Farmland's cleanup operations at the Woodbury Site, stated that the additional costs incurred by Farmland were a direct result of the actions of the CERC Parties:

> Farmland and McKesson's cost of remediating the Woodbury Site as outlined above was increased as a result of the activities of [the CERC Parties] and/or its agents including ... the movement of soil which had washed down onto the railroad tracks owned by CERC. Such activities spread the contaminated soil at the Site which had to removed at Farmland and McKesson's expense.

Pltf. Ex. 73, Manesh Affidavit ¶ 6. Farmland's expert testified that the total addition-

al cleanup cost due to the breach in the berm was $715,220. Although some of these costs are attributable to the initial washout, a large portion was made necessary by subsequent washouts that occurred when the berm was not repaired in a timely manner.

I turn next to the issue of fencing on the CERC properties. As President of CERC, Flanders had authority to order the installation of a fence around the CERC Parcels and/or consent to access to the Site by the EPA and Farmland for the purpose of fencing the CERC Parcels. Instead, Flanders and CERC consistently avoided their responsibilities, thereby necessitating increased response costs. In the interim, third parties indiscriminately dumped everything from rubber tires to dead dogs in piles on the property.

CERC and/or Mr. Flanders received warnings from the EPA and the Colorado Department of Health of the need to install a fence to prevent the accumulation of debris on the Site. Pltf. Ex. 23, 27, 41. Flanders was notified by the Colorado Department of Health (CDOH), Hazardous Materials and Waste Management Division by letter dated March 6, 1989, that CDOH had determined the dumping of trash on the CERC property to be a "threat to public health, a public nuisance under Section 16–13–305, and a violation of the Solid Waste Act, 30–20–102(2) and 113, Colorado Revised Statutes, as amended." Pltf. Ex. 23. On August 27, 1989, the EPA informed CERC that the fence needed "to go up immediately." Pltf. Ex. 27. CERC, however, refused to erect the fence or grant access to Farmland for that purpose. Among other concessions, CERC sought rental payments of nearly $85,000 per year for the use of the land to put up a fence. Pltf. Ex. 40A.

CERC even went so far as to write the Department of Justice in November 1990, requesting it to become involved in the negotiations. Pltf. Ex. 40D. In its letter, CERC stated: "From the beginning these negotiations have been conducted under the cloud of threats.... We will not succumb to threats from Farmland, EPA or anyone else in a power position—this is still America." It is not clear to what "threats" CERC refers. In any event, CERC does not present any credible reason why it consistently delayed in erecting the fence or granting fence access.

Again, it was only after the EPA issued a letter dated December 19, 1990, threatening to issue an Administrative Order for Access (Pltf. Ex. 41) that Flanders executed an access agreement for fencing on behalf of CERC.

Although some debris was already present on the Site in March 1989, fencing delay led to the accumulation of a vast amount of additional debris that had to be removed from the Site in accordance with the Site Work Plan, the EPA's Record of Decision on the Site and the Farmland and McKesson Consent Decree entered with the United States. Access for purposes of installing a fence was eventually granted by an agreement dated December 21, 1990. Farmland's expert testified that the total cost to Farmland and McKesson for the trash removal was $724,110. Pltf. Ex. 73.

Thus, the total cost incurred in responding to the activities of the CERC Parties was $1,439,330 ($715,220 + $724,110). Farmland paid 51% of those costs, or $734,058.30.

The CERC Parties have stipulated that the value of the CERC Parcels increased from zero dollars to between $615,000.00 and $630,000.00 following the completion of the remedial activities and the delisting of the Woodbury Site from the National Priorities List. The parties have also stipulated that prejudgment interest is to be calculated at 6.5% per annum, beginning from the date of the written demand (November 6, 1992).

## CONCLUSIONS OF LAW

The CERC Parties are liable parties under CERCLA Section 113(f)(2), 42 U.S.C.A. § 9613(f)(2). *Farmland Industries,* 922 F.Supp. 437. They are also owners and operators within the meaning of 42 U.S.C. § 9607.

The consent decree entered between the CERC Parties and the United States is not a bar to Farmland's claim for contribution under CERCLA § 113(f), 42 U.S.C.A. § 9613(f). *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1538 (10th

Cir.1995). The additional remediation costs incurred by Farmland are reasonable, necessary and consistent with the National Contingency Plan and are recoverable under CERCLA Section 113(f), 42 U.S.C.A. § 9613(f). *United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1538 (10th Cir.1995). Also, the additional remediation costs incurred by Farmland as a result of actions of the CERC Parties are separable and quantifiable. *See United States v. Colorado & Eastern R.R.,* 832 F.Supp. 304, 308–09 (D.Colo.1993).

■ Once liability is established, a party's share of liability is apportioned according to those equitable factors the court finds appropriate. 42 U.S.C. § 9613(f); *Environmental Transp. Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992); *Boeing Co. v. Cascade Corp.,* 920 F.Supp. 1121, 1132 (D.Or. 1996). Section 113 does not require me to consider a particular list of factors. *ENSCO,* 969 F.2d at 509; *Boeing,* 920 F.Supp. at 1132. Rather, I have broad discretion in allocating response costs among responsible parties. *FMC Corp. v. Aero Industries, Inc.,* 998 F.2d 842, 846 (10th Cir.1993); *United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir.1991). A court should use its moral, as well as its legal sense, in framing an equitable decree. *R.W. Meyer,* 932 F.2d at 572.

■ I may consider many factors, a few factors, or I may find one factor determinative. *CERC,* 50 F.3d at 1536. Among the factors many courts consider are the six "Gore Factors." *CERC,* 50 F.3d at 1536; *see, e.g., Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994); *ENSCO,* 969 F.2d at 508; *R.W. Meyer,* 932 F.2d at 571. The six Gore Factors are:

(i) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exer-

cised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or environment.

*CERC,* 50 F.3d at 1536, n. 5; *ENSCO,* 969 F.2d at 508. The Gore factors are neither exhaustive, nor exclusive. *CERC,* 50 F.3d at 1536, n. 5.

Federal courts have found several other factors to be appropriate for consideration under § 113(f) claims, for example: the state of mind of the parties, *R.W. Meyer,* 932 F.2d at 572; the financial resources of the parties, *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2d Cir.1992); the benefits received by the parties from contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities, *Weyerhaeuser Co. v. Koppers Co.,* 771 F.Supp. 1420, 1425 (D.Md.1991); and the relative fault of the parties, *ENSCO,* 969 F.2d at 509. "[U]nder § 9613(f), a court may consider any factor it deems in the interest of justice in allocating contribution recovery." *R.W. Meyer,* 932 F.2d at 572.

I previously determined that proof of causation of the particular remediation costs is not necessary to Farmland's contribution claim. *Farmland Industries,* 922 F.Supp. at 441–42. However, causation may be an important factor in my decision. *See Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 763 F.Supp. 384 (C.D.Ill.1991), *aff'd* 969 F.2d 503 (7th Cir.1992). I now reaffirm that the CERC Parties caused Farmland to incur additional remediation costs.

The degree of care exercised by a party in managing a Superfund site is another relevant equitable factor. *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 508 (7th Cir.1992); *Hatco Corp. v. W.R. Grace & Co.,* 836 F.Supp. 1049, 1079, 1091 (D.N.J.1993). In *Hatco,* the court considered that Hatco continued to make use of contaminated areas of the site long after it was aware that such use could worsen contamination or complicate future remedial ef-

forts, and the court allocated any additional expenditures required to remediate those areas to Hatco. *Id.* at 1091.

■ In addition, under common law theories of nuisance and trespass, a property owner has a duty to exercise reasonable care to prevent activities and conditions on its property that might injure others. *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir.1985) (stating that landowner is responsible for maintenance of contaminated property, even though another party placed chemicals on property); *see Sterling v. Velsicol Chemical Corp.*, 647 F.Supp. 303, 317 (W.D.Tenn.1986), *aff'd in part, rev'd in part,* 855 F.2d 1188 (6th Cir.1988) (stating that owner of property who contains hazardous waste thereon is answerable for the natural consequences of its escape); *Haas v. Lavin,* 625 F.2d 1384, 1387 (10th Cir.1980); *Moore v. Standard Paint & Glass Co.,* 145 Colo. 151, 358 P.2d 33, 36 (1960).

In *Shore Realty Corp.*, the Second Circuit stated that common law doctrines of nuisance are applicable to a CERCLA site. 759 F.2d at 1051. The court applied the Restatement (Second) of Torts § 839 cmt. d (1979) and held that a landowner was liable for maintaining a public nuisance (i.e. a contaminated site) regardless of the fact that other parties placed the chemicals on the site. *Id.* The Restatement (Second) of Torts § 839 cmt. d provides:

> Liability [of a possessor of land] is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others.

The CERC Parties' ownership and control of the CERC Parcels obligated the CERC Parties to exercise care and maintain the property to prevent injury to others. I will consider that obligation and the CERC Parties' actions under it when I weigh the equitable factors.

## ANALYSIS

■ I will consider the following equitable factors in allocating remedial costs here: (1) the relative fault of the parties (including causation); (2) the duties of the CERC parties as land owners; (3) the fourth through sixth Gore factors; (4) the state of mind of the parties; and (5) the benefits received by the parties as a result of the cleanup.

### 1. Relative Fault

I have already found that neither party caused the initial breach in the berm. However, this does not mean that the CERC Parties are without fault for the increased costs of remediation incurred by Farmland. The CERC Parties failed to fix the berm or give timely access to Farmland or the EPA to do so, thereby necessitating additional cleanup. In addition, Farmland is utterly without fault for either the original breach of the berm or the need for additional cleanup caused by the lengthy delay in fixing the berm. Farmland diligently attempted to clean up the entire Site and was hindered only by the CERC Parties' failure to cooperate.

Additionally, the CERC Parties failed to fence the CERC Parcels and refused to allow Farmland timely access to the CERC Parcels for the purpose of installing a fence to prevent the accumulation of debris on the Site. CERC and Mr. Flanders received warnings from the EPA and the Colorado Department of Health of the need to install a fence. Despite such warnings, CERC and Mr. Flanders denied timely access to the CERC property at the Site by, among other things, delaying the execution of an access agreement for 21 months. This delay led to the accumulation of a vast amount of additional debris that had to be removed from the Site in accordance with the Site Work Plan, the EPA's Record of Decision on the Site and the Farmland and McKesson Consent Decree entered with the United States.

### 2. The CERC Parties' duties as property owner

The degree of care exercised by a party in managing a Superfund site is an equitable factor that weighs against the CERC Parties.

In addition, under common law theories of nuisance and trespass, a property owner has a duty to exercise reasonable care to prevent activities and conditions on its property that might injure others.

The CERC Parties owned the CERC Parcels during the entire time washouts from the drainage ditch occurred and the trash and debris accumulated on the CERC Parcels. They failed to fix the berm or allow others to do so. In addition, they failed to fence the CERC Parcels, and refused for months to allow Farmland timely access to the CERC Parcels in order to construct a fence.

### 3. Gore Factors Four through Six

The fourth Gore Factor is "the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste." Farmland agreed to remediate the Site at its own expense even though it never actually owned the property or conducted any activities at the Site. Farmland's PRP status was premised on the involvement of its former subsidiary, Missouri Chemical Company, but Farmland entered a consent decree that provides expressly that it admits no liability. *See* Pltf. Ex. 69.

In addition, there is no evidence to suggest that Missouri Chemical Company caused any of the contamination on the Site. Rather, the evidence suggests that the majority of the contamination resulted from a fire at the pesticide plant when it was still owned by Woodbury Chemical Company. Although the CERC Parties attempted to argue otherwise at trial, Farmland and the CERC Parties are in essentially the same position— buyers of already-contaminated land. If anything, the CERC Parties should be held more responsible because CERC purchased the land after it had already been placed on the NPL, whereas Farmland's subsidiary only owned the property for a short time well before the contamination was discovered.

The fifth Gore Factor is "the degree of care exercised by the parties with respect to the hazardous waste concerned." Here again, the balance favors Farmland. By all accounts, Farmland has exercised the utmost diligence with regard to cleaning up the contamination at the Site. The CERC Parties

have shown little concern for anything beyond their own interests. For example, they admitted to consistently moving dirt off of their railroad tracks without regard for its effects, yet they made no credible effort to repair the breach in the berm that was causing the problems.

The sixth Gore Factor is "the degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment." Once more, the CERC Parties refused to allow Farmland and the EPA access to clean up the Site until threatened by the EPA. In addition, CERC had actual knowledge that dumping of trash on the Site would interfere with the EPA-mandated cleanup. Mr. Flanders personally had knowledge of the need to fence the CERC parcels in accordance with the Site cleanup plan. Despite this knowledge, the CERC Parties failed to install the fence as mandated by the EPA as part of the cleanup activities and engaged in various tactics that delayed the installation of the fence. CERC failed even to pay the $100,000 to the EPA as part of its consent decree.

### 4. State of Mind

Perhaps the most stark contrast between Farmland and the CERC Parties is the difference in mindset apparent during remediation. Farmland seemed eminently interested in cleaning up the Site while the CERC Parties seemed entirely engrossed with how to avoid any responsibility for the cleanup. For example, rather than granting immediate access to the property to erect a fence, Flanders stalled, apparently in an attempt to make a profit off of Farmland's need to fence the property. In addition, there is strong evidence to suggest that Flanders did everything he could to divert all of CERC's assets to other entities in an effort to avoid paying any remedial costs.

### 5. Benefits from Cleanup

The EPA published its notice of intent to delete the Site from the National Priorities List, and it was deleted. The parties stipulated that the value of the CERC Parcels increased by more than $600,000 as a result of the cleanup. Given that Farmland garnered no tangible benefit from the cleanup of land it no longer owns, it would be inequita-

ble not to allocate significant additional remedial costs to the CERC Parties.

Weighing all of these factors, I hold that the CERC Parties should bear 85% of the costs associated with the ditch washouts and 90% of the costs associated with the debris cleanup. Farmland's costs associated with the ditch washouts total 51% of $715,220, or $364,762.20. Farmland's costs associated with the debris cleanup total 51% of $724,110, or $369,296.10. Therefore, the CERC Parties are jointly and severally liable for 85% of $364,762.20, or $310,047.87, and 90% of $369,296.10, or $332,366.49. Thus, the total award to Farmland is $642,414.36. Farmland is also entitled to prejudgment interest at the stipulated rate of 6.5% per annum starting from November 6, 1992, and postjudgment interest at the statutory rate of 8.5% per annum.

Accordingly, it is ORDERED that

1. The CERC Parties are jointly and severally liable to Farmland for $642,414.36, plus 6.5% prejudgment interest from November 6, 1992, and 8.5% postjudgment interest;

2. Farmland is awarded its costs.